2012 ME 99

**DALE HENDERSON LOGGING, INC.**

v.

**DEPARTMENT OF
TRANSPORTATION.**

**Oak Leaf Realty, Inc., et al.**

v.

**Department of Transportation.**

Supreme Judicial Court of Maine.

Argued: June 15, 2012.
Decided: July 19, 2012.

Timothy A. Pease, Esq. (orally), Rudman & Winchell, LLC, Bangor, for appellants Dale Henderson Logging, Inc., and Oak Leaf Realty, Inc.

Rebecca H. Farnum, Esq. and Jason P. Donovan, Esq. (orally), Thompson & Bowie, LLP, Portland, for appellee Department of Transportation.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, MEAD, GORMAN, and JABAR, JJ.

MEAD, J.

[¶ 1] In these consolidated cases, Dale Henderson is the principal owner of Dale Henderson Logging, Inc. (DHL), and Oak Leaf Realty, Inc. (OLR). DHL owns property in Washington County, and OLR owns several thousand acres in Hancock County. The DHL and OLR properties have a four-rod-wide rail corridor running over them that was once owned by the Maine Central Railroad Company and later conveyed to the State of Maine, which the Department of Transportation (DOT) claims to own in fee simple absolute by virtue of deeds given to Maine Central's predecessor in title from 1897 to 1898. DHL and OLR assert that Maine Central held only a railroad easement that it abandoned prior to its purported conveyance to the State, and therefore DOT now owns nothing. Alternatively, OLR contends that if DOT holds an interest in the corridor, two deeds in DOT's chain of title contain covenants allowing OLR to compel DOT to build and maintain a fence along a portion of the corridor in Hancock County.

[¶ 2] DHL and OLR appeal from summary judgments entered in favor of DOT by the Superior Court (*Hunter, J.*, Washington and Hancock Counties) on their complaints seeking (1) a declaration that they own the portions of the corridor running over their respective properties in fee simple absolute, unburdened by any easement; (2) a declaration that if DOT holds an interest in the portion of the corridor claimed by OLR, then it must build and maintain a fence along it; and (3) injunctive relief barring DOT from conducting any activities in the corridor.

[¶ 3] We conclude that pursuant to the Short Form Deeds Act, 33 M.R.S. §§ 761–775 (2011), and former 23 M.R.S.A. § 4207(3) ("An Act to Protect Railroad Rights-of-way"),[1] the court correctly found that DOT holds an easement that has not been abandoned in the Washington County portion of the corridor, and owns the fee simple in the Hancock County portion of the corridor. We further conclude that the covenants requiring Maine Central to build and maintain a fence along the corri-

---

1. In the version pertinent to this appeal, 23 M.R.S.A. § 4207(3) was enacted by P.L. 1985, ch. 398 (effective Sept. 19, 1985). It was repealed by P.L. 1989, ch. 398, § 4 (effective Sept. 30, 1989), and replaced with 23 M.R.S. § 7105(3), P.L. 1989, ch. 398, § 7 (effective Sept. 30, 1989). The two sections remain substantively the same, *see* 23 M.R.S. § 7105(3) (2011).

dor are not enforceable against DOT in equity. Accordingly, we affirm the judgments.

## I. BACKGROUND

### A. *Dale Henderson Logging, Inc.*

[¶ 4] The historical facts are not disputed. *See Hilderbrand v. Wash. Cnty. Comm'rs*, 2011 ME 132, ¶ 7, 33 A.3d 425 (stating that the facts on a motion for summary judgment are viewed in the light most favorable to the nonmoving party). The issue on appeal is a legal one; accordingly, we review the summary judgment ruling de novo to determine whether any party is entitled to a judgment as a matter of law. *See McIlroy v. Gibson's Apple Orchard*, 2012 ME 59, ¶ 7, 43 A.3d 948.

[¶ 5] In 2008, DHL bought two parcels of property in the Town of Steuben in Washington County. The rail corridor claimed by DOT runs over DHL's land for approximately 845 feet. The railroad tracks and ties have been removed, and the corridor is now managed by DOT and the Department of Conservation as part of the Down East Sunrise Trail. DOT's stated goal is to use the corridor for recreational purposes on an interim basis as a way to rehabilitate and protect it until conditions and funding warrant the resumption of rail service.

[¶ 6] The rail corridor originated in March 1896, when, pursuant to statute, the Washington County Commissioners approved the location of a rail line filed by the Washington County Railroad Company (WCRC). In January 1898, DHL's predecessors-in-title gave two deeds to WCRC; one of the central issues in this appeal is whether the two deeds conveyed a fee interest, as DOT contends, or whether, as DHL asserts, the deeds simply confirmed the easement that was created when the Washington County Commissioners approved WCRC's filing and thereby completed its taking of the corridor by eminent domain.

[¶ 7] In 1911, the Legislature merged WCRC into the Maine Central Railroad Company, which then acquired all of WCRC's property holdings. In August 1985, Maine Central filed an application with the Interstate Commerce Commission (ICC) to abandon service along the corridor; the application was approved in November 1985. In June 1987, Maine Central conveyed whatever interest it then had in the rail corridor to the State of Maine, which eventually used the corridor to create the Down East Sunrise Trail.

[¶ 8] DHL purchased the properties at issue on December 22, 2008; two days later it filed suit against the State. In June 2009, DOT moved for summary judgment. The court issued two orders resolving the motion. In the first, the court granted DHL partial summary judgment and declared that WCRC had acquired only an easement in the corridor, and therefore DHL owned the fee underlying the easement. The court deferred deciding whether the easement had been abandoned. Following further briefing, the court issued a supplemental order declaring that the easement had not been abandoned, and therefore DOT continues to own an easement for railroad purposes over DHL's land.

### B. *Oak Leaf Realty, Inc.*

[¶ 9] The historical facts in *Oak Leaf Realty, Inc.*, closely parallel those in *Dale Henderson Logging, Inc.*, insofar as both cases arise from the 1893 formation of the Washington County Railroad Company; the approval of the location of its rail line by the county commissioners; WCRC's merger into Maine Central Railroad Company in 1911; the ICC's approval of Maine Central abandoning rail service on the line

in 1985; Maine Central's conveyance of whatever interest it held in the rail corridor to the State in 1987; and the State's current interim use of the corridor as a recreational trail while it seeks to restore rail service.

[¶ 10] Specific to this case, OLR owns several thousand acres of land in the Town of Hancock in Hancock County. The rail corridor crosses OLR's land for approximately 21,400 feet. In May 2008, OLR filed suit against DOT. In April 2009, the State moved for partial summary judgment concerning ownership of the fee in the corridor. The court granted the motion and declared that the State owned the section of the corridor at issue in fee simple absolute. In August 2009, the State again moved for partial summary judgment concerning its obligation to build and maintain a fence along a portion of the corridor. That motion was also granted when the court found that a release deed given to Maine Central in 1929 extinguished the original covenants requiring a fence. These appeals followed.

## II.  DISCUSSION

### A.  The Short Form Deeds Act

■ [¶ 11] In both of these cases the Superior Court was required to resolve the question of what interests were conveyed by the ancient deeds involved. The court concluded in *Dale Henderson Logging, Inc.*, that only an easement was conveyed, and determined in *Oak Leaf Realty, Inc.*, that a fee simple was given. We review the interpretation of a deed de novo as a question of law. *Stanton v. Strong*, 2012 ME 48, ¶ 8, 40 A.3d 1013; *Tarason v. Wesson Realty, LLC*, 2012 ME 47, ¶ 18, 40 A.3d 1005.

[¶ 12] The trial court discussed the Short Form Deeds Act (SFDA) in reaching its decisions, and we conclude that the Act is dispositive in each of these cases. The SFDA provides, in part:

> In a conveyance or reservation of real estate, the terms "heirs," "successors," "assigns," "forever" or other technical words of inheritance, or an habendum clause, are not necessary to convey or reserve an estate in fee. A conveyance or reservation of real estate, whether made before or after the effective date of this section, must be construed to convey or reserve an estate in fee simple, unless a different intention clearly appears in the deed.

33 M.R.S. § 772(1). In *Tarason*, we discussed and applied the SFDA, noting that section 772(1) requires that any conveyance of property not exempted by the Act's "savings clause" be construed to grant a fee simple interest "unless a different intention clearly appears in the deed." 2012 ME 47, ¶¶ 12–18, 40 A.3d 1005 (quotation marks omitted). The SFDA is to be liberally construed. *Id.* ¶ 13; 33 M.R.S. § 772(5).

■ [¶ 13] In *Dale Henderson Logging, Inc.*, the two deeds at issue contain a restriction: "This conveyance of right of way is for Railroad purposes only." When discussing the potential application of the SFDA, the trial court found that the restriction constituted "clear and limiting language in the source conveyances" indicating "that the Grantors intended to convey no more than rights of way, i.e. easements." We agree with the court's finding. There is nothing ambiguous about the language used,[2] and the only reason to insert the restriction "[t]his con-

2. If the language were found to be ambiguous, then we would be required to construe the deeds as conveying a fee simple interest.

*See Tarason v. Wesson Realty, LLC*, 2012 ME 47, ¶ 18 n. 8, 40 A.3d 1005.

veyance of right of way is for Railroad purposes only" is to make clear that a fee interest is not what the deed conveys. Accordingly, because the restriction is evidence of "a different intention clearly appear[ing] in the deed," 33 M.R.S. § 772(1), application of the SFDA leads to the court's result—unless it was abandoned, discussed *infra,* DOT holds an easement, not a fee simple, in the rail corridor.

■ [¶ 14] In contrast, the operative deeds in *Oak Leaf Realty, Inc.,* do not contain any similar restriction, and on their face the deeds convey a fee simple interest. OLR asserts that because WCRC initially took an easement interest in the rail corridor by eminent domain, when read in context the deeds obtained from landowners shortly after the taking do not convey any additional interest, but rather serve only to memorialize the taking and to fix damages. In an SFDA analysis, however, the only relevant evidence of an intention to convey something other than a fee simple interest is evidence that appears in the deed itself. Therefore, if there were evidence within the four corners of the deeds at issue to indicate that they served only to memorialize WCRC's taking by eminent domain or to fix damages for that taking, that evidence would be relevant. In this case, there is no such indication clearly appearing in the deeds. Accordingly, the trial court correctly applied the SFDA in finding that, absent such evidence, the original grantors conveyed a fee simple to WCRC, which is now held by DOT.

[¶ 15] OLR further asserts that if the deeds conveyed any additional interest, they are ambiguous as to what that interest was, and therefore we must consider extrinsic evidence to discern the parties' intent. Assuming *arguendo* that OLR is correct and the deeds are ambiguous, *Tar-*

*ason* clarified the outcome required by the SFDA in that situation:

> The statute requires a deed to be construed as conveying an estate in fee simple unless "a different intention clearly appears *in the deed.*" 33 M.R.S. § 772(1) (emphasis added). Accordingly, if the language of the deed is deemed ambiguous, a court would not look to extrinsic sources to determine the intent of the parties to the deed, as would apply when construing a deed in other contexts ... but would instead be required to construe the deed as creating a fee simple estate.

2012 ME 47, ¶ 18 n. 8, 40 A.3d 1005 (citations omitted). Accordingly, OLR's premise leads to the Superior Court's conclusion that DOT owns the corridor traversing OLR's land in fee simple.

B. Abandonment

■ [¶ 16] In *Dale Henderson Logging, Inc.,* DHL contends that the easement originally taken by WCRC was abandoned when Maine Central filed an application with the ICC to discontinue rail service, and then did not use the easement in the nineteen-month period between the approval of its request and its purported transfer of the easement to the State in June 1987. In essence, DHL argues that DOT took nothing because in 1987 Maine Central held nothing. To make a prima facie showing of abandonment under the common law standard, DHL would be required to establish that Maine Central demonstrated "a history of nonuse coupled with an act or omission evincing a clear intent to abandon" its easement. *Laux v. Harrington,* 2012 ME 18, ¶ 21, 38 A.3d 318.

[¶ 17] In this case, we need not reach the question of whether DHL could meet its burden under the common law standard because we agree with the trial court's

finding that former 23 M.R.S.A. § 4207(3) is dispositive of DHL's abandonment claim. Effective September 19, 1985, section 4207(3) provided, in part:

> B. The abandonment of service shall not mean or infer that the rights-of-way on a railroad line have been abandoned. In the event that the railroad, any person, firm or corporation, or any agency shows interest in the eventual restoration of service, the rights-of-way shall not be deemed abandoned.
>
> Since it is in the best interest of the State to retain the rights-of-way intact, this paragraph shall apply to all existing and future rights-of-way created prior to or following the effective date of this section, as amended.
>
> C. Whenever the department acquires railroad lines, to hold and to manage for future railroad uses, those lines shall not be considered abandoned for railroad purposes. The commissioner shall periodically review the need to hold those lines for future railroad uses.

P.L. 1985, ch. 398 (effective Sept. 19, 1985).

[¶ 18] Maine Central filed its application to abandon rail service along the corridor on August 21, 1985, about one month before section 4207(3) became effective. The ICC's order approving the request was not issued until November 4, 1985, after the effective date of the statute. Because the application could have been denied, or could have been withdrawn before it was approved, Maine Central did not actually abandon its rail service until November 4, 1985, after section 4207(3) had taken effect. Accordingly, if DOT "show[ed] interest in the eventual restoration of service" during the nineteen-month period between the ICC's order and Maine Central's sale of the corridor to the State, 23 M.R.S.A. § 4207(3)(B), then by statute Maine Central's right-of-way could not be deemed abandoned, *id.*

[¶ 19] There is ample evidence in the summary judgment record to support the court's finding that DOT showed interest in the eventual restoration of rail service in the corridor. On November 5, 1985, one day after the ICC ruled that Maine Central could abandon rail service, Maine voters approved a bond issue to purchase the line once the ICC's ruling became effective on November 30, 1985. *See* P. & S.L.1985, ch. 75. Dana Connors, DOT Commissioner from 1984 to 1994, averred that the purpose of the bond was to maintain the corridor for future rail use; DOT entered into negotiations with Maine Central after November 30, 1985, to acquire the corridor; and "[t]hroughout [his] tenure as Commissioner, the Department showed an interest in eventual restoration of service on the Calais Branch line."

[¶ 20] The record also supports a finding that following DOT's purchase of the corridor easement, it has held and managed it "for future railroad uses," *see* 23 M.R.S.A. § 4207(3)(C); 23 M.R.S. § 7105(3)(C) (2011). Accordingly, "th[at] line[ ] shall not be considered abandoned for railroad purposes." 23 M.R.S.A. § 4207(3)(C); 23 M.R.S. § 7105(3)(C) (2011). Connors averred that DOT had issued several requests for proposals from short line operators to restore service, a statement supported by Department correspondence and other documents in the record. Nathan Moulton, a rail program official for DOT, stated in his affidavit that since shortly after acquiring the corridor, and continuing to the date of the affidavit in June 2009, "the [DOT] has expended significant time, labor and money on the inspection and maintenance of the Calais Branch." Moulton averred that the bridges, culverts and tracks on the corridor are inspected annually, and that in 2000 and 2001, DOT spent $767,500.47 maintaining the corridor, all with the goal

"to maintain the Calais Branch rail line in such a condition to allow for the future resumption of rail service thereon."

[¶ 21] Finally, contrary to DHL's assertion that the easement has been abandoned because the State has converted property that was taken expressly for rail purposes into a public recreation trail, the Legislature has indicated that the ultimate purpose of the corridor remains the resumption of rail service. In 2007, it provided by statute that "[t]he Department of Transportation reserves the right to terminate at any time the use of the Calais Branch rail corridor for recreational purposes and to use the Calais Branch rail corridor for railroad purposes." 23 M.R.S. § 7108(2) (2011). The statute is clear legislative support for DOT's assertions in the summary judgment record, admitted by DHL, that "Maine DOT's goal is to rehabilitate, preserve and protect the corridor for future railroad use should conditions and funding warrant," and that "[i]n the interim until rail service is reestablished, the rail corridor will be available for recreational use."

[¶ 22] In sum, as the motion court concluded in its thoughtful and thorough decision, "[t]he Legislature passed the Act [to Protect Railroad Rights-of-way] for the exact circumstances before the court: to defer the abandonment of railroad easements where the State has expressed an interest in holding and managing the easements for future railroad use." That observation leads to the court's correct result—the easement acquired by DOT from Maine Central was not abandoned and remains viable.

## C. Fence Covenants

[¶ 23] In *Oak Leaf Realty, Inc.*, two of the deeds in DOT's chain of title, both given to WCRC by Mary and Theodore Austin in 1897, contain a restrictive covenant:

> Said Company by acceptance of this deed for itself, its successors and assigns, becomes bound to and agrees with said Grantors herein, their heirs and assigns, as follows: ... (2) To construct and maintain fences on both sides of said four rod strip made of poles and "Pages" wire fencing or some other wire fencing of equal merit, not dangerous to cattle, and said fences shall be provided with gates for use in connection [3] with each of said crossings, when they are constructed.

The record indicates that a fence once existed, but it has not been maintained for decades.

[¶ 24] In 1929, the heirs of Mary and Theodore Austin gave Maine Central a release from its obligation to build and maintain a fence. The release contained a new obligation:

> And [Maine Central] by the acceptance of this deed for itself, its successors and assigns, becomes bound to and agrees with said [Austin heirs], their heirs and assigns, as follows:
>
> > (a) To construct and maintain on the property of the [Austin heirs] adjacent to said four (4) rod strip at an agreed location reasonable and suitable therefor, a public siding to hold four (4) cars ... and to agree to maintain said sidetrack as long as reasonably warranted by the amount of traffic offered[.]

DOT acknowledges that there is no evidence that the siding was ever built.

---

3. One deed uses the word "connection" and the other "construction." The difference is immaterial.

[¶ 25] The Superior Court declared that DOT was not obligated to build or maintain a fence along the Austin portion of the rail corridor after construing the 1929 release to be immediately effective, and not conditioned on Maine Central's future fulfillment of its agreement to build a siding. As an initial matter, we note that the court's decision only resolves the issue as to one of the two original Austin deeds conveying 13,752 feet of the rail corridor; the release does not reference the deed conveying an additional 1,827 feet of the corridor.

[¶ 26] DOT argues that the court's decision concerning the effect of the release was correct, and that for several other reasons the second deed's covenant is ineffective as well. OLR frames the issue as whether the release was a substituted contract, meaning that Maine Central's obligation to build a fence was immediately discharged when the release was signed, or an accord and satisfaction, in which case the obligation was not discharged until the new obligation to build a siding was performed. *See Rosenthal v. Rosenthal,* 543 A.2d 348, 354–55 (Me.1988) (discussing accord and satisfaction versus substituted contract). OLR did not present that argument to the trial court in its opposition to DOT's motion for summary judgment, although it opposed the motion for other reasons.

[¶ 27] We do not need to characterize the release, however, because we conclude that regardless of whether it was a substituted contract or an accord and satisfaction, the obligation it imposed to build a siding, and the fence covenants in the original deeds, are no longer enforceable in equity. We have said that "[a] restrictive covenant will be enforced in equity only if it is reasonable under the circumstances,"

*Green v. Lawrence,* 2005 ME 90, ¶ 11, 877 A.2d 1079, and have observed that

> [c]ourts in this country have adopted a flexible approach toward the enforcement of covenants which "touch and concern" the land and impose obligations affirmative in nature upon the owners of burdened property. A variety of factors are relevant to the determination of enforceability, including the reasonableness of the obligation imposed in terms of its scope and duration. . . .

*Day v. McEwen,* 385 A.2d 790, 793 (Me. 1978).

[¶ 28] The 1929 release implicitly recognized that at some point a cattle fence along a rail corridor, and the rail siding meant to substitute for it thirty-two years later, would become unnecessary when the volume of rail traffic no longer warranted either. Although we proceed cautiously before nullifying a covenant in equity, certainly that point has been reached in this case, where the fence has not been maintained for decades; there has officially been no rail traffic in the corridor for twenty-seven years; the tracks are gone; and even if constructed, the fence would protect only a portion of the corridor abutted by OLR's property. As a matter of logic, if the obligation to maintain a siding no longer mattered to the grantors once the amount of rail traffic no longer warranted one, as the release states, then there is no reason, under the current circumstances, to enforce the obligation to maintain a fence, which, according to OLR, acted as a form of collateral to ensure that the siding was built. Given this record, equity does not require DOT to reconstruct and maintain in perpetuity a fence to protect OLR's nonexistent cattle from a currently nonexistent rail line.[4]

---

4. The original covenants required a fence "not dangerous to cattle," but it is evident that OLR is not seeking a fence to protect cattle. Its opposition to DOT's motion for

The entry is:

Judgments affirmed.

summary judgment states: "If the State insists that the requirement to build a fence only exists if there are cattle on Henderson's land, then that could easily be arranged."