STATE OF MAINE
WALDO, ss

SUPERIOR COURT
Civil Action
Docket No. RE-2019-0018

JEFFREY R. MABEE, et al.,

Plaintiffs

v.

**DECISION AND JUDGMENT**

NORDIC AQUAFARMS INC., et al.,

Defendants.

This litigation arose coincident to defendant Nordic Aquafarm Inc.'s (hereinafter referred to as "Nordic") announcement of a plan to develop a commercial fish farm in Belfast, Maine near the Penobscot Bay. This announcement stoked concerns among some community members, some of whom are Plaintiffs in this litigation, over the development of the fish farm. The primary legal dispute between the plaintiffs and Nordic in this case centers around title to a section of the intertidal flats[1] running along the Bay in the vicinity of the Little River and U.S. Route 1. The particular disputed flats adjoin the upland properties depicted on Belfast Tax Map 29 as Lots 35, 36, 37, and 38.[2] Nordic hopes to install underground pipes through Lot 36 to access the Bay and use the pipes to feed water to the fish farm and carry water discharge from it. To facilitate this plan, Nordic negotiated an agreement to purchase usage rights for the flats appurtenant to Lot 36 from the owners of the Lot, defendants Janet and Richard Eckrote. Plaintiffs claim that the Eckrotes do not own the intertidal flats along their Lot and have no right to permit Nordic to use the intertidal property. Plaintiffs assert

---

[1] The term "intertidal flats" refers to the land along an ocean (or other tidally influenced water body) that lies between the mean high-water line and mean low-water line of the ocean. *Almeder v. Town of Kennebunkport*, 2019 ME 151, ¶ 8 & n. 7, 217 A.3d 1111. The term is synonymous with "shore" and "wet sand." *Almeder v. Town of Kennebunkport*, 2019 ME 151, ¶ 8 & n. 7, 217 A.3d 1111.

[2] At the time this action was brought, plaintiffs Jeffrey Mabee and Judith Grace were owners of the upland depicted on the tax map as Lot 38 and defendants Janet and Richard Eckrote were the owners of Lot 36. Lot 37 was owned by Donald and Wendy Schweikert and Lot 35 was owned by Lyndon Morgan.

1

that the rightful owners of these intertidal flats as well as those flats along the upland[3] property of Lots 35, 36, and 37 are plaintiffs Jeffrey Mabee and Judith Grace, the current owners of Lot 38. Amongst other claims, Plaintiffs also assert that a conservation easement that Mabee and Grace granted to party-in-interest Upstream Watch, which was then assigned to plaintiff Friends of Harriet L. Hartley Conservation Area, prohibits Nordic's planned usage of the land. Defendants dispute Plaintiffs' claims to title over the intertidal land and their other claims concerning it. Finally, Plaintiffs contend that the deed which conveyed title to the Eckrotes' predecessor in interest, Frederick Poor, contains a restrictive covenant that prohibits use of the land for commercial purposes, including housing pipes for a commercial fish farm.

Plaintiffs' have pled their claims against Defendants in a five-count complaint. Count I (Declaratory Relief) and Count II (Quiet Title) seek a judgment from the Court declaring that plaintiffs Judith B. Grace and Jeffrey R. Mabee are the rightful owners of this disputed section of the shore, that a certain lease granted by the defendants Richard and Janet Eckrote to Nordic Aquafarms for use of a section of the shore is invalid, and other related relief to quiet title to the disputed property. Count III and Count IV both seek injunctions against Defendants and other parties in interest to prohibit these parties from asserting title to the shore, from violating the provisions of Plaintiffs' conservation easement, and taking other actions adverse to Plaintiffs' alleged property rights. Count V brings a claim for slander of title against Nordic.

In turn, Nordic has brought counterclaims against Plaintiffs, which it pleads in two counts. Count I seeks a declaratory judgment determining that Plaintiffs "have no property rights requiring [Nordic] to obtain permission or a property interest from them in order to bury its seawater pipes for aquaculture under the Eckrotes' upland and under the adjacent intertidal zone." (Nordic's Ans. at pg. 16 (Feb 10, 2020)). Count II brings a claim for tortious interference with an advantageous relationship against Plaintiffs and party-in-interest Upstream Watch.

---

[3] The term "upland," refers to "the land above the mean high water mark—that is, landward of the beach." *Almeder*, 2019 ME 151, ¶ 8, 217 A.3d 1111.

The Eckrotes have also brought their own counterclaims against Plaintiffs. Count I of their counterclaims seeks a declaratory judgment that they have fee title to the intertidal land appurtenant to their Lot and that Plaintiffs have no property rights in this disputed land. Count II asserts that the Eckrotes have established title to this land through adverse possession. Count III brings a claim for slander of title against Plaintiffs. Count IV asserts that Plaintiffs are liable under the common law of torts and 14 M.R.S. § 7551-B for trespassing on the Eckrotes' intertidal land. Count V requests that the Court find that the Eckrotes have established title to the disputed flats through boundary by acquiescence. Count VI requests a court order quieting title to the disputed flats in the Eckrotes' favor on the grounds described above. Count VII brings a claim for tortious interference with an advantageous relationship against Plaintiffs and Upstream.

The parties have agreed that in the first phase of this jury-waived trial the parties will try Counts I, II, III, and IV of Plaintiffs' complaint, Counts I, II, V, and VI of the counterclaims filed by defendants Janet and Richard Eckrote, and Count I of the counterclaims filed by Nordic. (*See* "Order on Motion to Bifurcate" entered on November 18, 2018.) The remaining counts will be tried in the second phase of the trial, which will proceed at a later date. The first phase of the trial was held on June 23, 24, and 25, 2021. The Court conducted a site visit on June 23, 2021 where the undersigned justice viewed the land in dispute while accompanied by the parties' attorneys and the parties' designated expert witnesses. After the presentation of evidence, the Court received post-trial briefs from the parties presenting their arguments on the merits of their claims and defenses.

The following map provides a rough sketch of the area in dispute, it is based on Belfast Tax Map 29 and is the same sketch that was provided in the Court's previous orders on Plaintiffs' motions for summary judgment. The sketch is not in the trial record and is not relied on as evidence. It is provided here only to assist the reader by providing a simplified visual of the area at issue.[4]

---

[4] The Court further notes that Belfast Tax Map 29 is referenced in the survey plans produced by Defendants' expert, James Dorsky, which have been submitted into the record. (*see e.g.* Pl.'s Ex. 6, 9.) Those survey plans label the Eckrote, Schweikert, Morgan, and Mabee and Grace parcels with the same lot numbers used on the tax map.

3



This sketch is based on Page 29 of the Belfast Tax Maps and is annotated to show the relative position of the various properties situated northeast of little River on Penobscot Bay.

Sketch 1

## I. TRIAL RECORD

The Court has studied the testimony of the witnesses, deeds, surveyor's reports, and the other evidence presented at trial that was admitted into the record. The trial record is too voluminous for the Court to reiterate all of the facts that are reflected in the evidence nor are all of the facts in the record material to the matters the Court must decide in this phase of the trial. Therefore, the Court will use the following paragraphs to describe what it believes to be the evidence most pertinent to the issues before the Court and what it believes is necessary background information for interested members of the public to understand the Court's judgment.

### A. Harriet Hartley's Conveyances and the Parties' Chains of Title

The land now contained in Lots 35 (Morgan), 36 (Eckrotes), 37 (Schweikerts), and 38 (Mabee and Grace) depicted on Belfast Tax Map 29, including the intertidal land adjoining these Lots, were once all part of a tract of waterfront real estate owned by Harriet L. Hartley. Jeffrey Mabee, Judith Grace, Janet Eckrote, Richard Eckrote, Donald Schweikert, Wendy Schweikert, and Lyndon Morgan all trace their respective titles back through numerous conveyances occurring over many years which

4

are all rooted in the various deeds that Harriet L. Hartley used to convey portions of her tract of waterfront land between 1946 and 1950.

Hartley took sole ownership of this parcel of land including the parties' current lots on February 10, 1935, after the death of her husband Arthur Hartley. (Stip. Facts re: Title ¶¶ 14-15.) The boundaries of this original parcel are described by a 1934 deed recorded in Waldo County Registry of Deeds in Book 386 on page 453[5] that transferred the title to Hartley and her husband as joint tenants. The deed states:

> A certain lot or parcel of land situated in Belfast in the County of Waldo and State of Maine, bounded and described as follows, to wit: Bounded northerly by land of Adoniram Moody and land owned by W. L. West, deceased, at the time of his decease; easterly by Penobscot Bay; southerly by Little River and land of Belfast Water District and westerly by land conveyed by Eva T. Burd and Ewin D. Burd to Milton B. Mills by deed recorded in Waldo Registry of Deeds.

(*Id.* ¶ 14, Ex. 10.) The parties' disputes over the intertidal land are all rooted in the language of the deeds that Hartley used for subsequent conveyances of the above property.

The first conveyance of note was between Hartley and one of the Eckrotes' predecessors in title, Frederick Poor, on January 25, 1946, memorialized by a deed recorded in Book 452 at page 205. (*Id.* ¶ 16.) The deed describes the boundaries of the lot with the following language.

> A certain lot or parcel of land situated in Belfast in the County of Waldo and State of Maine, bounded and described as follows, vis: Beginning at the head of a gully in the center of a concrete culvert which is on or near the southerly bound of the Atlantic Highway; thence Southeasterly following the bottom of the gully 275 ft. more or less to an iron bolt in the mouth of a brook; thence Easterly and Northeasterly along high water mark of Penobscot Bay 410 ft. more or less to a stake at the outlet of a gully; thence Northerly up the bottom of the said gully 100 ft.; thence West 507 feet to the center of a gully on or near the southerly bound of the Atlantic Highway; thence Westerly along the southerly bound of said highway, 206 feet to the point of beginning.

(Stip. Facts re: Title, ¶ 21.) The deed also provides that "the lot or parcel of land herein described is conveyed to Fred R. Poor with the understanding it is to be used for residential purposes only, that no business for profit is to be conducted there unless agreed to by Harriet L. Hartley, her heirs or assigns." (*Id.* ¶ 19.) Today, the land Fred Poor acquired in that deed is roughly depicted by the areas marked

---

[5] All of the deeds at issue in this case are recorded in the Waldo County Registry of Deeds.

as Lots 35 and 36 on Belfast Tax Map 29. (*see e.g.,* Pl.'s Ex. 5A, 66; Stip. Facts ¶¶ 25-29.) After a series of conveyances, the Eckrotes acquired the land marked Lot 36 and Lyndon Morgan acquired the land marked Lot 35. (*see e.g.,* Pl.'s Ex. 5A, 66; Stip. Facts re: Title ¶¶ 25-29.) One of the principal issues in this phase of the litigation is whether the land Fred Poor acquired from Hartley, and which is now owned respectively by the Eckrotes and Morgan, includes the intertidal land appurtenant to the upland property.

After her conveyance to Poor, Hartley conveyed another lot along Penobscot Bay, to the north of and directly adjacent to the Poor lot, to Samuel Cassida on October 25, 1946. (Stip Facts re: Title ¶ 22.) The deed, recorded in Book 438 at page 497, described the property being conveyed as:

> A certain lot or parcel of land situated in Belfast, bounded and described as follows: Beginning, at an iron bolt in the southerly bound of the Atlantic Highway and at the southwest corner of land of Samuel Cassida; thence south 61° 51' east along the southerly bound of land of said Cassida 687 ft. an iron bolt on the top of the bank of Penobscot Bay; thence continuing same course 12° more or less to high water mark of said Bay; thence southwesterly and westerly along high water mark of said Bay 650 ft. more or less to a stake at the mouth of a gully on the southeast corner of land of Fred R. Poor; thence northerly up the bottom of the gully 100 ft. along land of said Poor; thence west along land of said Poor 527 ft. to the point of beginning.

(Stip. Facts re: Title ¶ 22, Ex. 12.) That deed then continues and states "[a]lso conveying whatever right, title, or interest I may have in and to the land between high and low water marks of Penobscot Bay in front of the above described lot[,]" which both Plaintiffs and Defendants agree is an express conveyance of the intertidal flats appurtenant to the upland. (*Id.*)

Hartley's last conveyance of note was on September 22, 1950, to the Plaintiffs' and Schweikerts' predecessors in interest, William and Pauline Butler. (*Id.* ¶ 24.) This 1950 conveyance to the Butlers relates to the parcel identified as Lots 37 and 38 on Belfast Tax Map 29. The deed, recorded in Book 474 at page 387, describes this parcel with the following language:

> A certain lot or parcel of land with the buildings thereon situated in Belfast in the County of Waldo and State of Maine on the easterly side of the Atlantic Highway and bounded and described as follows, to wit: Northerly by land of Fred R. Poor, Easterly by Penobscot Bay, Southerly by Little River and Westerly by Atlantic Highway.

6

(*Id.* ¶ 24.) It is upon this deed that Plaintiffs' base their claim to title of all of the intertidal flats adjacent to the parcels now identified as Lots 35, 36, 37, and 38 on Belfast Tax Map 29.

The Butlers held on to this parcel until conveying it to Marjorie and Ernest Bell on May 13, 1961, using the same description as that in the 1950 Hartley-to-Butlers deed. (*Id.* ¶ 31, Ex. 20.) The Bells eventually transferred a portion of this property to one of the Schweikerts' predecessors in interest, John and Catherine Grady on May 18, 1964. (*Id.* ¶ 32.) This deed, recorded in Book 621 at page 288, delineated the new parcel with the following description:

> . . . thence South 48 20' East one hundred thirty-eight (138) feet, more or less, to an iron pin and continuing on the same course thirty-nine (39) feet, more or less, to the high water mark of Penobscot Bay; thence turning and running northeasterly along said high water mark three hundred thirty-three (333) feet, more or less, to an iron pipe; thence turning and running generally northwesterly and following the gully that marks the line between land of Ernest J. Bell and Marjorie N. Bell, and land of Fred R. Poor, to the point of beginning.

(*Id.* ¶ 33.) The property was then conveyed multiple times with the same property description and was eventually acquired by the Schweikerts from Larry Theye and Betty Becker-Theye on November 20, 2019, through a deed recorded at Book 4441 at page 184. (*Id.* ¶¶ 34-37.)

Following her husband's death, Marjorie Bell conveyed the remaining land that she and her husband had acquired from the Butlers to Virginia and Willis Trainor on October 17, 1966. (*Id.* ¶ 40-41.) The Bells-to-Trainors deed described the boundaries of this property by reciting the same description used in the 1950 Hartley-to-Butlers deed and then excepting the land the Bells had transferred to the Gradys from the conveyance. (*Id.* ¶ 41.) The property that the Bells conveyed to the Trainors was thereafter transferred amongst various owners until it was acquired by plaintiffs Mabee and Grace on May 31, 1991, through a deed recorded at Book 1221 at page 347. (*Id.* ¶¶ 39-55.)

**B. Leases and Easements Concerning the Intertidal Land**

On August 6, 2018, the Eckrotes entered into a purchase and sale agreement with Nordic for an easement pertaining to Lot 37. (Pl.'s Ex. 37.) The agreement provides for the sale of perpetual usage rights to Nordic for the purpose of constructing and operating underground water pipes and

7

related utilities in the Eckrotes' land in exchange for $150,000 and for various remediation and improvements to the Eckrotes' property. (*Id.* 1, 3.) The agreement provides that the closing of this sale is subject to a number of conditions precedent such as Nordic obtaining all permits necessary to develop and operate its fish farm and Nordic's determination that the Eckrotes' property is suitable for use in its project. (*Id.* at 5-6.)

Plaintiffs Mabee and Grace conveyed a conservation easement to party-in-interest Upstream Watch through a deed which was recorded on April 29, 2019, in Book 4367 at page 280 and which was accepted by Upstream Watch on the same date. (Pl.'s Ex. 62 at 1, 10.) The deed describes the area affected by the conservation easement as all of the intertidal land that Mabee and Grace have claimed title to in this litigation. (*see* Pl.'s Ex. 62 at "Exhibit A.") The deed purports to grant Upstream the right to enforce various covenants restricting the usage of the intertidal land and which generally provide for the conservation of that land. (Pl.'s Ex. 62 at 1-4.) On November 4, 2019, Upstream Watch assigned this conservation easement to plaintiff Friends of the Harriet L. Hartley Conservation Area. (Pl.'s Ex. 63.)

Plaintiffs have alleged that the Schweikerts "entered a Ground Lease with [Nordic], dated July 11, 2020, allegedly granting [Nordic] any title, right or interest the Schweikerts "may have" in the intertidal on which their lot fronts." (Compl. ¶ 145.) The plaintiffs' complaint requests a judgment declaring that this ground lease is null and void, as well as an injunction prohibiting Nordic from using this "ground lease" or claiming title under it. (*Id.* at pg. 43, 48.) However, Plaintiffs did not present this "ground lease" at trial and it is not included in the trial record. Nor have Plaintiffs presented other evidence demonstrating the existence of this alleged "ground lease."

## C. Surveyor Donald Richards' Opinion

To support their claim that Mabee and Grace are the rightful owners of the intertidal land, Plaintiffs presented expert testimony from their surveyor Donald Richards. Plaintiffs employed Mr. Richards to develop various surveys to chart the property boundaries at issue as the ownership of the

8

land in this area evolved from Hartley's sole ownership in the 1930s to the parcels resulting from her subsequent conveyances to Fred Poor, Samuel Cassida, and the Butlers. Mr. Richards' surveys also depict the boundaries of the Lots owned by the parties' as he believes they now stand in the present day. Plaintiffs entered several of the surveys Mr. Richards produced into evidence as well as some demonstrative sketches he made to depict the changes in real estate ownership and boundary lines over the years. The surveys Mr. Richards produced represent his opinion as to both how the deeds at issue should be interpreted and his opinion, based on his fieldwork, as to the locations on the face of the earth called in the metes and bounds descriptions of each of the deeds. In all of Mr. Richards' surveys that were admitted into evidence, he portrayed Mabee and Grace as the owners of the intertidal land appurtenant to Lots 35, 36, 37, and 38.

According to Mr. Richards' theory regarding the disputed real estate, the 1946 deed conveying land from Hartley-to-Poor should be read as conveying only upland property. He opines that the deed describes the waterside boundary as running to and along the high-water mark of the Bay and that this description resulted in a severance of the upland from the flats, with Hartley retaining the flats along Poor's upland for herself. Mr. Richards proposes that Hartley then conveyed the flats appurtenant to Poor's upland to the Butlers in 1950, which he believes is indicated by Hartley's use of the language "Northerly by land of Fred R. Poor, Easterly by Penobscot Bay" to describe the boundaries of the property. He further proposes that the subsequent deed conveying land from the Bells (the Butlers' successors in interest) to the Gradys (the Schweikert's predecessors in interest) conveyed only an upland parcel to the Gradys, as he believes the Hartley-to-Poor deed did. As the Butlers retained the upland of Lot 38 along with all of the intertidal land they purportedly acquired from Hartley, Richards opines that when Marjorie Bell transferred her remaining land which she had obtained from the Butlers to the Trainors (Mabee and Grace's predecessors in interest), she transferred the upland now known on Belfast Tax Map 29 as Lot 38 along with the intertidal running along Lots 38, 37, 36, and 35. He therefore believes that when Mabee and Grace eventually obtained this parcel from the Trainors' successors, Mabee and Grace obtained Lot 38, its appurtenant flats, and also all of the flats

9

running along Lots 37, 36, and 35. In his opinion, Plaintiffs' intertidal land extends to the southerly boundary of the land that Hartley conveyed to Samuel Cassida in 1946.

Mr. Richards' testimony regarding the existence and location of the waterside monuments used in the metes and bounds description of the Hartley-to-Poor deed was a matter of particular interest to the parties. Again, this waterside boundary call is: "thence Southeasterly following the bottom of the gully 275 ft. more or less to an iron bolt in the mouth of a brook; thence Easterly and Northeasterly along high water mark of Penobscot Bay 410 ft. more or less to a stake at the outlet of a gully[.]" Mr. Richards testified that the mouth of a brook is the "junction of a brook and the larger water body, which in this case is Penobscot Bay." (Trial Tr. vol I at 56 (June 22, 2021)). He also testified that he understood a brook as being defined "by water coming down between a land of high elevation, banks. . ." and that the terminus of the brook is "at the point at which the water coming down through is no longer encompassed within banks" and enters the larger water body. (*Id.* at 57.) He further offered his opinion that the mouth of a brook that flows to the ocean is always at the high-water mark of the ocean. (*Id.* at 143-144.)

Mr. Richards testified that he was able to locate the mouth of the brook but was unable to locate the iron pin referenced in the Hartley-to-Poor deed. Based on his understanding of the term "mouth of a brook" and his field work, Mr. Richards testified that point called to in the deed is located at the "center of the brook at the high water mark of Penobscot Bay" and 290 feet along the bottom of the gully from the previous call. (Trial Tr. vol I at 55-56.) However, in the most recently dated survey from Mr. Richards, he depicts this boundary as being located a short distance below the high-water mark. (Pl.'s Ex. 66) (survey dated April 2021). On cross examination, Richards agreed that on that survey he "set the boundary below the high tide mark in the mouth of the brook." (Trial Tr. vol II at 8-9 (June 23, 2021)).

In regard to the next waterside call, "along high water mark of Penobscot Bay 410 ft. more or less to a stake at the outlet of a gully[,]" Mr. Richards indicated that he located the outlet of the gully

10

and that, by his measurement, the outlet of the gully is between 407 and 413 feet along the high water mark from the point he determined as the location the deed called to in the mouth of the brook. (Trial Tr. vol I at 73.) He did not testify that he found the stake referenced in the Hartley-to-Poor deed, he instead indicated that he found two iron pins lying on the ground in the immediate area of what he considered the outlet of the gully. (*see id.* at 58.) Regarding one of these pins, depicted in Pl.'s Ex. 46, he remarked ""[i]t may have been the pin called for in one of the deeds. [t]here could have been more than one pin over time simply because one may have gotten eroded or heaved out of the ground another replaced. So this is one pin that was there when I first arrived." (*Id.* at 60; *see also id.* at 61.)

## D. The Testimony of Defendants' Surveyor John Dorsky

Mr. Dorsky is a professional surveyor who was employed by Nordic to survey the land in dispute and testified as an expert witness for the defendants. Both parties submitted surveys produced by Mr. Dorsky into evidence. As with Mr. Richards' surveys, these exhibits represent Mr. Dorsky's opinion based on his interpretation of the boundaries identified in the deeds and the results of his field work. The surveys produced by Mr. Dorsky are largely similar to Mr. Richards' but with clear and important differences. Most notably, Mr. Dorsky does not agree with Mr. Richards' theory that the Hartley-to-Poor deed reserved the appurtenant intertidal flats for Hartley and that Hartley then conveyed those flats to the Butlers. In his earlier surveys of the area, Mr. Dorsky indicates that he viewed the ownership of the intertidal flats along the Lot 37, 36, and 35 uplands as unclear. (*See e.g.,* Pl.'s Ex. 9) (Dorsky's survey dated Nov. 14, 2018). However, at trial he testified that his opinion had since developed and, based on his understanding of the deeds and Maine real estate law, he believes that the intertidal flats in front of those lots are owned by the owner of the respective appurtenant upland lots, as opposed to plaintiffs Mabee and Grace as Mr. Richards believes. (*see e.g.,* Trial Tr. vol II at 131-140.) He further remarked that if Mr. Morgan and the Eckrotes do not own the intertidal along their respective lots then he thinks Hartley never conveyed the land to Fred Poor or anyone else and it therefore would belong to Hartley's heirs. (*Id.* at 137.)

The parties also questioned Mr. Dorsky extensively regarding his interpretation of the waterside boundary calls in the Hartley-to-Poor deed and his fieldwork related to it. Like Mr. Richards, Mr. Dorsky was unable to locate the "iron bolt in the mouth of a brook." (Trial Tr. vol II at 145.) He did not testify as to whether he was able to locate the "stake at the outlet of a gully" or whether he also found the iron pins laying on the ground in the area that Mr. Richards testified to finding them on. However, his survey dated November 14, 2018[6] indicates that he found some rebar "0.3' above ground" about 26 feet inland from the high-water mark where the gully is located. (Pl.'s Ex. 9). Mr. Dorsky appears to have located these sideline boundary points by reference to the natural monuments (i.e. the mouth of the brook, the high-water mark of the Bay, and the outlet of the gully).

Mr. Dorsky defined the "mouth of a brook" somewhat differently than Mr. Richards. Mr. Dorsky testified that the mouth of a flowing water body, such as a brook or river, is "where the flowing water body, . . ., enters the receiving water body." (Trial Tr. vol II at 144.) He indicated that when the receiving water body is an ocean, the point at which the brook would enter the ocean (i.e. its mouth) would follow the ebb and flow of the tide, such that at high tide the mouth would be at the high water line and at low tide the mouth would be at the low water line. (*Id.* at 144.)

Mr. Dorsky's opinion also differs from Mr. Richards as to whether the calls to the "iron bolt in the mouth of a brook," the "outlet of a gully," and "along high water mark of Penobscot Bay" trigger a presumption that a deed conveying upland waterfront property also conveys the appurtenant shoreland. As this Court will explain later in this order, Maine's common law provides generally that when a deed conveying oceanfront property describes the property boundaries with a 'call to the water' it is presumed that the deed conveys the flats along with the upland. Mr. Dorsky believes that the above calls do act as a 'call to the water' and thus trigger the presumption that the Hartley-to-Poor deed conveyed the flats to Poor along with the upland described in the deed.

---

[6] Notes on the survey plan indicate it was updated between July 24, 2020 and November 14, 2018 to reflect Mr. Dorsky's developing opinion as to who owns the various sections of intertidal flats depicted on the survey and also to remove depictions of the littoral zones.

12

When asked why a grantor of upland oceanfront property who also wishes to convey the appurtenant flats might reference a measurement along the high-water mark when describing the boundaries of the property, Mr. Dorsky responded that describing the waterside boundary with a measurement along the length of the high-water mark is "pretty much the standard practice. It's just an easier location to do the measurements." (Trial Tr. vol III at 49-50 (June 25, 2021)). He explained that measuring along the high-water mark is easier, as opposed to measuring along the low water mark, because the high-water mark is "accessible pretty much all the time" and "the low water mark is covered with water most of the time." (*Id.*)

## E. Hartley's Will

Harriet Hartley died testate on October 18, 1951. (Stip. Facts re: "Harriet L. Hartley's Estate . . ." at ¶ 1.) Her last will and testament is dated September 25, 1945 and was admitted into probate in a Pennsylvania court sometime thereafter. (*Id.* ¶¶ 3-6.) The will was executed before her conveyance to Fred Poor in January 1946. (*Id.* ¶ 1.) The will states that Hartley intended to give:

> Ruth Hartley Weaver. . . the furnished house and garage at Belfast, Waldo County, Maine for her use during her life time. . .This house and garage shall include the plot of ground extending from Littler River, Belfast, Maine on the South to a line at the top of the hill on which there is a row of blackberry bushes, on the east of the plot is Penobscot Bay and on the West is the State Highway.
>
> . . . To my nephew, Samuel Nelson Woods Jr. I give, . . . the balance of the ground owned by me in Belfast, Maine. This includes the lot beyond the blackberry bushes known as the Knoll lot, also the lot upon which Frederick Poor has a cottage. . . and also includes all the ground north of the lot up to what is described in the deed as Moody's line and is now the Southern line of the property known as the Rainbow Cabins. All of these lots are bounded by Penobscot Bay on the East and the State Highway on the West, the Northern line is marked by monuments.

(*Id.,* Ex. 1 at 1.) The probate file from the Pennsylvania Registry of Wills does not indicate any real property described in the will or other real estate in Maine was transferred to Harriet Hartley's heirs after her death. (*Id.* at ¶ 4.)

## F. Janet Eckrote's Testimony

Janet Eckrote testified as follows. She acquired title to the property now known on the tax map as Lot 36 in September 2012. (Trial Tr. vol III at 184 (June 24, 2021)). The property was previously owned jointly by her mother and father William and Phyllis J. Poor until her father died, leaving her mother as the sole owner. (*Id.*) Before William and Phyllis, the property was owned by her grandfather Frederick Poor who had acquired the property from Hartley in 1946. (*Id.*) Prior to this, Janet Eckrote's great-grandfather Clarence Poor had rented the property. (*Id.* at 185.)

Ms. Eckrote identified a receipt from 1885 which indicates that Clarence Poor rented a parcel of "Shore, Land, and Right of Way used and occupied by the 'Allan Cottage.'" (*Id.* at 186-187; Def.'s Ex. 30.) The property continues to have a cottage upon it to the present day. She recalls visiting her grandparents at the cottage with her family at least twice every summer beginning in the late 1950s. (Trial Tr. vol III at 188.) She recalls the cottage being about 20 feet wide and 20 feet long and being located on the edge of the bank with a porch extending out towards the water. When Ms. Eckrote and her family were out on the porch during high tide, they would be surrounded by water that would flow underneath the porch. (*Id.* at 200.) She identified defense exhibit 20 as depicting the porch of this old cottage and confirmed that water would flow under the wooden supports depicted in the photo. (*Id.* at 213.) She recalls the interior of the cottage as being "extremely rustic" and stated: "[i]t was really a playground, [a] place to go to see how people used to live. It had a pot belly stove way in the back. It had an outhouse that we used to the right. It had two metal beds in the living area." (*Id.* at 215.) The cottage degraded over time, becoming unstable. (*Id.* at 203-205.) In 1975, the cottage was moved because it was in an advanced state of disrepair. (*Id.* at 199, 201, 203-205.) Ms. Eckrote opined that the cause of the cottage's instability was its presence on the water and opined the cottage would have ended up in the water if it was not moved at that time. (*Id.* at 199, 204.)

Ms. Eckrote provided testimony regarding her family's use of the property over the years and identified a number of photos as depicting members of her family using the shore along the upland for

14

recreational purposes. She also testified that the Poor family had owned a motorboat in the 1960s and would moor the boat in the intertidal area along the property. (*Id.* at 210.) She does not recall any objections to her family's use of the intertidal flats throughout her family's ownership before she acquired the property. (*Id.* at 190.) She does not recall any objection to her family's use of the intertidal flats after she acquired the property until she received an email from Jeffrey Mabee in 2018 with such an objection. (*Id.* at 190-191.)

Ms. Eckrote also testified as to her opinion regarding the proper boundaries of her property. She testified that she owns the whole of the intertidal between the sideline boundaries of her property, describing her intertidal with the following response: "From boundary to boundary going straight out, without having other than the lowest tide, any definition to it, maybe the brook would give a line to a certain way. But basically from the – from the location of the cabin and straight out would be my interpretation without any physical boundaries" (*Id.* at 200.) She stated that the brook running between her and the Schweikerts' property could be seen at all times in the intertidal zone running through the flats to the ocean and that she understood this brook as providing the boundary between her intertidal area and the Schweikerts'. (*Id.* at 201, 213-214.)

## II.  ANALYSIS: FINDINGS OF FACT AND CONCLUSIONS OF LAW

Of all of the matters at issue in this phase of the trial, the matter of most consequence is Plaintiffs' claim that they have title to the intertidal flats appurtenant to the uplands of Lot 36 i.e., the flats that Plaintiffs claim was excluded from Hartley's conveyance to Frederick Poor in 1946 and that the Eckrotes' now own. The enforceability of Plaintiffs' conservation easement depends upon them actually having title to that land as do many of Plaintiffs' demands for injunctive and declaratory relief, including those pertaining to Nordic's plans to lay underground pipes for its fish farm. Therefore, the Court will address the issue of whether Plaintiffs are the rightful owners of this section of the disputed shoreland first.

15

As Plaintiffs are the ones who have brought this suit and who affirmatively seek to establish title to this intertidal land and enforce their purported property rights to it, they bear the burden of proof on this issue. *Markley v. Semle*, 1998 ME 145, ¶ 5, 713 A.2d 945; *Hodgdon v. Campbell*, 411 A.2d 667, 670-71 (Me. 1980); *Blance v. Alley*, 330 A.2d 796, 798 (Me. 1975). To prevail, the plaintiffs cannot rest their case merely on the weakness of their opponents' claims to the disputed property, they must prove both their own title and prove that their title is superior to the defendants' title. *Blance*, 330 A.2d at 798 ("A plaintiff may succeed in placing a boundary line on the face of the earth, but, if he fails to establish his title to the land on his side of the line, his is an illusory victory amounting to naught."); *Hann v. Merrill*, 305 A.2d 545, 550 (Me. 1972) ("In order to be entitled to judgment for possession of this parcel the Plaintiff must prove the title she has alleged... If the Plaintiff shows no title she cannot prevail even though she proves the defendant has no title."); *Powers v. Hambleton*, 106 Me. 217, 219 (1909) ("It is a familiar rule that the plaintiff must recover, if at all, upon the strength of his own title, and not upon the weakness of that of the defendant.").

## A. Maine Law Regarding the Interpretation of Deeds

To determine whether Plaintiffs' have proven that they are the rightful owners of the disputed intertidal land, the Court must interpret the deeds in the plaintiffs' and defendants' chains of title. The "cardinal rule" which guides the Court's analysis is: "the expressed intention of the parties, gathered from all parts of the instrument, giving each word its due force, and read in the light of existing conditions and circumstances." *Sleeper v. Loring*, 2013 ME 112, ¶ 16, 83 A.3d 769; *Perry v. Buswell*, 113 Me. 399, 401, 94 A. 483, 484 (1915). The Court endeavors to give effect to that intention to the extent it can be ascertained. *McGeechan v. Sherwood*, 2000 ME 188, ¶ 36, 760 A.2d 1068; *Whitmore v. Brown*, 100 Me. 410, 412-13, 61 A. 985, 986-87 (1905). To ascertain that intention, the Court first examines the deed as a whole, "giving the words their general and ordinary meaning to see if they create any ambiguity." *Bennett v. Tracy*, 1999 ME 165, ¶ 8, 740 A.2d 571; *see also Silsby v. Belch*, 2008 ME 104, ¶ 12, 952 A.2d 218 ("The focus of the analysis is on the common and ordinary meaning of the

16

language."); *N. Sebago Shores, LLC v. Mazzaglia*, 2007 ME 81, ¶ 13, 926 A.2d 728 ("In evaluating the language of a deed, courts should give effect to the common or everyday meanings of the words in the instrument."). If there is no ambiguity, then the Court will look no further than the deed to determine the parties' intent. *Bennett*, 1999 ME 165, ¶ 7, 740 A.2d 571. If, however, the language is ambiguous, the Court will examine any relevant extrinsic evidence presented by the parties to determine the grantor and grantee's intent, including "the circumstances existing at the time of the making of the deed or the contemporaneous construction of the deed by the grantee or grantor." *Almeder v. Town of Kennebunkport*, 2019 ME 151, ¶ 26, 217 A.3d 1111. "In the absence of extrinsic evidence, the intent of the parties should be ascertained by resort to the rules of construction of deeds." *Id.* A deed contains ambiguity if the language in the deed is reasonably susceptible to two or more different interpretations. *River Dale Ass'n v. Bloss*, 2006 ME 86, ¶ 6, 901 A.2d 809. A deed also contains ambiguity where it is shown that the deed's description of the property is unclear when it is applied to the ground. *Lloyd v. Benson*, 2006 ME 129, ¶ 8, 910 A.2d 1048; *Snyder v. Haagen*, 679 A.2d 510, 513 (Me. 1996).

When adjudicating a boundary dispute regarding ownership of intertidal property, the Court must also be cognizant of a set of rules which have arisen from the Massachusetts Colonial Ordinance of 1641-47 and which are now reflected in Maine's common law regarding intertidal property. *See Almeder*, 2019 ME 151, ¶¶ 28, 37, 217 A.3d 1111; *Bell v. Town of Wells*, 510 A.2d 509, 512-515 (Me. 1986). The Colonial Ordinance provides that "the owner of upland oceanfront property presumptively owns to the low water mark. . ." *Almeder*, 2019 ME 151, ¶ 37, 217 A.3d 1111; *Bell*, 510 A.2d at 515, 515 n. 11. However, the Law Court has held that "[b]ecause the beach may be conveyed separately from the upland, an owner only benefits from this presumption where a grant of property specifically includes a call to the water." *Almeder*, 2019 ME 151, ¶ 37, 217 A.3d 1111. The rule "applies only in cases where the grantor, seised of the upland and flats, in conveying his land, bounds the land sold on the sea or salt water, or describes other boundaries of equivalent meaning, without any reservation of the flats." *Id.* (quoting *Storer v. Freeman*, 6 Mass. 435, 439 (1810)). "Terms such as

'Atlantic Ocean,' 'ocean,' 'cove,' 'sea,' or 'river' are calls to the water that trigger the presumption." *Id.* However, language that limits a grant "to" or "by" the "shore, beach, bank, or seashore may defeat the presumption." *Id.*; *see also Bell*, 510 A.2d at 515 n.11 ("By specific language in deeds an owner may, of course, convey the upland without the intertidal zone, or the intertidal zone without the upland."); *Sinford v. Watts*, 123 Me. 230, 232 (Me. 1923) ("[T]he owner of upland adjoining tide-water prima facie owns to low-water mark . . . The flats are his unless the presumption is rebutted by proof to the contrary. Of course the owner of both may convey both, or he may convey either without the other. The question in a given case is what has he done.").

Also of note, two other interpretative rules have been developed by the Maine courts to assist with determining whether a grantor intended to sever the tidal flats from upland property in a deed conveying oceanfront property. The first, is "the rule that where the two ends of a line by the shore are at high water mark, in the absence of other calls or circumstances showing a contrary intention, the boundary will be construed as excluding the shore." *Whitmore*, 100 Me. at 415. The second is that "if one of the termini of the boundary by the shore is at low water mark, and the other, according to the technical construction of the call in the deed, is at high-water mark, the shore will be regarded as included in the conveyance, because of the strong presumption, under these circumstances, that such was the intention of the grantor." *Dunton v. Parker*, 97 Me. 461, 469 (1903).

## B. Title to the Intertidal Flats Appurtenant to the Eckrote and Morgan Uplands

To prove superior title to the intertidal flats along the Eckrote and Morgan uplands, the Plaintiffs must establish two points: (1) that these intertidal flats were <u>not</u> conveyed to Frederick Poor in the January 1946 Hartley-to-Poor deed and (2) that Hartley did convey those same intertidal flats to the Butlers in the 1950 Hartley-to-Butlers deed. As explained in the following paragraphs, the Court has determined that Plaintiffs have not succeeded in either of these tasks.

18

1. Plaintiffs have failed to prove that their predecessors in interest, William and Pauline Butler, obtained title to the disputed intertidal flats through the Hartley-to-Butlers deed.

Plaintiffs claim title to the intertidal land appurtenant to the Eckrotes' upland based on their theory that when Hartley conveyed land to Poor in January 1946, she conveyed only the upland property between the iron bolt in the mouth of the brook and the gully referenced in the Hartley-to-Poor deed. They argue that the deed's description of the waterside boundary as running to "an iron bolt in the mouth of a brook; thence Easterly and Northeasterly along high water mark of Penobscot Bay 410 ft. more or less to a stake at the outlet of a gully" establishes that Hartley intended to sever the intertidal flats from the upland and reserve them for herself. They contend that Hartley then conveyed this intertidal land to the Butlers in 1950. They then argue that the subsequent conveyance of a portion of this property from the Butler's successor in interest, the Bells, to the Grady's in 1964 did not convey any of the intertidal property. Thus, Plaintiffs maintain that when the Bells conveyed the remaining portion of the land they had acquired from the Butlers to Plaintiffs' predecessors in interest, they conveyed the entirety of Hartley's former intertidal property along the Penobscot Bay, up to the intertidal land that she had granted to Samuel Cassida in October 1946. (This would be the intertidal land appurtenant to Lots 35, 36, 37, and 38 depicted on Belfast Tax Map 29.)

The Court has studied the evidence and the parties' arguments in depth and is unpersuaded by Plaintiffs' theory, as it requires the Court to take a convoluted reading of the property description in the Hartley-to-Butlers deed that is in apparent conflict with Hartley's expressed intent and also requires the Court to overlook the context provided by Hartley's earlier conveyances to Fred Poor and Samuel Cassida, which conflicts with Plaintiffs' theory.

To begin, the Hartley-to-Butlers deed describes the land being conveyed with four boundary lines called by reference to four monuments in four general directions, ostensibly from the center of the parcel: "Northerly by land of Fred R. Poor, Easterly by Penobscot Bay, Southerly by Little River and Westerly by Atlantic Highway, so called." (Stip. Facts re: Title ¶ 24.) When given its common

and ordinary meaning, this simple description appears on its face to describe a four-sided, roughly rectangular shaped parcel lying between the Bay and the Atlantic Highway with the northern most boundary of the property terminating at the edge of the parcel that Hartley conveyed to Poor in 1946. Plaintiffs' theory, however, proposes that the Court interpret this deed as instead describing a six-sided parcel, roughly shaped like a shoe, that reaches past the immediate boundary line of the Poor upland, encompassing all of the intertidal land adjoining the Poor upland, until terminating at the boundary of the property Hartley conveyed previously to Samuel Cassida in October, 1946.

This reading is problematic for a number of reasons. The first of which being that the Hartley-to-Butlers deed describes only four boundary lines, as opposed to the six that Plaintiffs' theory presupposes. Even more problematic, is that the Hartley-to-Butlers deed does not provide any description indicating the boundaries of the supposed Butler intertidal land appurtenant to Poor's upland. The Hartley-to-Butler deed does not make any reference to the Butler intertidal land terminating at the land she previously conveyed to Samuel Cassida,[7] nor did Hartley make any reference in the deed to any other monument or identifying feature that would mark the terminus of the proposed property boundary as it wraps around the edge of the Poor upland following the Bay, nor does it call to any other monument marking this supposed intertidal boundary, provide an estimated distance, or other reference to delineate the borders of this additional intertidal property boundary beyond the immediate borders of the Butlers' upland. Nor does Hartley ever even reference the intertidal land in front of Poor's upland or otherwise indicate that the parcel includes intertidal land beyond that which is immediately in front of the Butlers' uplands.

The conspicuous omission of calls in the Hartley-to-Butlers deed describing the boundaries of the purported, additional intertidal land in front of Poor's upland that Plaintiffs believe was conveyed to the Butlers strongly indicates that Hartley did not intend to convey any of that intertidal land in

---

[7] Plaintiffs' theory would require the Court to conclude that Hartley intended to bound the parcel on one side by the land that she previously conveyed to Samuel Cassida in circumstances where the deed makes no reference to Cassida's land as a monument.

20

front of Fred Poor's upland to the Butlers at all. All of the above points indicate to the Court that, based on the common and ordinary meaning of the four calls in the deed, Harriet Hartley intended to convey a four-sided waterfront parcel to the Butlers which was bounded on its northerly edge by Fred Poor's property boundary and did not extend into the intertidal flats adjoining Poor's upland. Again, the guiding focus of the Court in interpreting a deed is to ascertain the "expressed intention" of the deed's grantor and grantee. It is this expressed intention to convey the additional flats that Plaintiffs have failed to show here.

This reading is further supported when the language of the Hartley-to-Butlers deed is read along with the Hartley-to-Poor deed, as the Court must in this case. The Hartley-to-Poor deed was executed four years prior to the Hartley-to-Butlers deed. The property description in the Hartley-to-Poor deed (see the "background" section of this judgment), although somewhat problematic in its own right, indicates that Hartley was capable of using detailed and specific language to describe the boundaries of the lots that she was conveying along the Penobscot Bay. The Poor deed includes many references to monuments and approximate distances for each boundary line delineating Poor's lot. Given the detail with which she described the property boundaries in the Poor deed, it is highly unlikely that Hartley would convey the intertidal land adjoining Poor's upland to the Butlers without clearly describing the boundaries of such land as Plaintiffs propose. If Hartley intended to convey such land in the Hartley-to-Butlers deed, it stands to reason that she would have described the property using calls indicating a property boundary along Poor's upland and delineating the terminus of this additional intertidal land. The fact that Hartley did not do so is telling and indicates that she did not intend to convey any of that intertidal land to the Butlers.

Plaintiffs' theory is also seemingly at odds with the general notion prevailing in this state at the time of Hartley's conveyances that, pursuant to the Colonial Ordinance of 1641-47, an owner of upland property along the waterfront also holds title to the adjoining intertidal zone. *See Bell*, 510 A.2d 509 at 515, 515 n. 11; *Sinford*, 123 Me. at 232; *Proctor v. Me. C. R. Co.*, 96 Me. 458, 467, 52 A. 933, 935

(1902); *Snow v. Mt. Desert Island Real-Estate Co.*, 84 Me. 14, 17, 24 A. 429, 430 (1891). The *Snow* court commented that it was "common knowledge" that since the Ordinance, "occupation of the flats has usually followed that of the upland" and that "conveyances of the upland are commonly supposed to convey the flats." *Snow*, 84 Me. at 17. Given this context, a severance of the intertidal land appurtenant to Poor's upland and then conveyance of that land in a later deed, as Plaintiffs suggest occurred, would be seen as unusual. It stands to reason therefore that if Hartley intended to convey the intertidal land along Fred Poor's upland to the Butlers, she would have done so with language that at the very least refers to this intertidal land and roughly delineates the boundaries of such land in order to address the commonly held notion that intertidal flats are owned by the owner of the immediately adjacent upland property.

In sum, Plaintiffs' theory that Hartley conveyed the intertidal flats in front of the Poor upland to the Butlers in 1950 is inconsistent with the ordinary meaning of the language in the Hartley-to-Butlers deed and if adopted would require the Court to overlook a number of pitfalls in the plaintiffs' interpretation of the deeds. The most notable of these pitfalls are that the Hartley-to-Butlers deed does not make any reference to the intertidal land in front of Poor's upland and does not provide monuments to delineate the boundaries of such intertidal property. For these and the other reasons discussed above, the Court concludes that Plaintiffs have failed to show that Hartley conveyed the disputed intertidal land to Plaintiffs' predecessors in interest William and Pauline Butler in 1950. Because Plaintiffs have failed to establish their own title to the disputed intertidal land through the Butlers, they have failed to carry their burden of proving superior title, even if one were to assume that Hartley reserved the disputed intertidal land for herself when she conveyed the adjoining upland property to Fred Poor in 1946.

2. Plaintiffs Have Failed to Prove that the 1946 Hartley-to-Poor Deed Severs the Intertidal from the Upland and Reserved the Upland for Hartley

22

When analyzed according to Maine's law governing the interpretation of deeds, the evidence in the record indicates that the Hartley-to-Poor deed conveyed the disputed flats to Poor along with the upland.

Both parties in this case have focused much of their attention on the waterside boundary call of the deed: "Southeasterly following the bottom of the gully 275 ft. more or less to an iron bolt in the mouth of a brook; thence Easterly and Northeasterly along high water mark of Penobscot Bay 410 ft. more or less to a stake at the outlet of a gully[.]" Plaintiffs contend that the language unambiguously states that the boundaries are to run only to the landward edge of the shore (i.e. to the "high water mark"), excluding the intertidal flats from the conveyance. In turn, Defendants contend that this language constitutes a specific 'call to the water' as a boundary which triggers the rule from the Colonial Ordinance that a deed of waterfront property with such a call presumptively conveys the intertidal flats along the upland. They further argue that the extrinsic evidence indicates that Hartley did not intend to sever the flats in her conveyance to Poor and that this evidence may generate latent ambiguity.

As the party seeking to establish that the Hartley-to-Poor deed severed the intertidal from the Poor upland and that these intertidal flats were conveyed to Mabee and Grace, it is incumbent on the Plaintiffs to demonstrate in the first instance that this deed severed the flats from the upland. Maine's common law provides that a deed conveying oceanfront real estate which bounds the land conveyed "on the sea or salt water, or describes other boundaries of equivalent meaning, without any reservation of the flats[,]" triggers a presumption that the deed conveyed the flats appurtenant to the upland. *Almeder*, 2019 ME 151, ¶ 37, 217 A.3d 1111 (quoting *Storer*, 6 Mass. at 439). Yet, almost two hundred years ago, the Law Court articulated that "a deed bounding a piece of land by high-water mark, which is one side of the shore, cannot be construed as conveying the flats." *Lapish v. President of Bangor Bank*, 8 Me. 85, 89-90 (1831). The Law Court has also held that a grant "to the shore and then by the shore, unqualified, excludes the shore, but when one or both termini of that call are at the low water mark,

it includes the land to the low water mark." *Haagen*, 679 A.2d at 515 (explaining the holding in *Whitmore*, 100 Me. at 414). Here, Plaintiffs maintain that the deed's grant "to an iron bolt in the mouth of a brook; thence Easterly and Northeasterly along high water mark of Penobscot Bay 410 ft. more or less to a stake at the outlet of a gully" unambiguously bounds the land on the high-water mark of the Bay (i.e. it conveys only to the landward side of the shore) and thus does not trigger the presumption or convey the flats. However, Hartley and Poor's intent here is not nearly as unambiguous as Plaintiffs maintain.

The Hartley-to-Poor deed never expressly indicates that the grant is "to[8]" or "by" the high-water mark, shore, beach, bank, seawall, or other similar monument delineating the point where the upland ends and the intertidal begins. Rather, the deed states "along high-water mark of Penobscot Bay 410 ft. more or less. . ." Because of the nature of the land in question, it is uncertain whether Hartley and Poor's reference to a measurement "410 ft. more or less" along the high-water mark indicates an intent to use the high-water line as a marker showing the terminus of the property boundary or an intent to use the high-water line as simply a convenient point at which to provide the estimated length of the waterside boundary. Nor is it clear that all of the other monuments called to in the deed are monuments that lie only on upland property. When applied to the ground, it is evident that both of the sideline boundary calls "to an iron bolt in the mouth of a brook" and "to a stake at the outlet of a gully" are unclear due to the disappearance of the iron bolt and the stake, the nature of the land, and the language used to describe the grant. As the Court will soon explain, the uncertainty resulting from these factors causes Hartley and Poor's intention to become unclear as to whether they intended to include the intertidal flats in the conveyance or to set the boundary at the high-water mark and exclude the flats. This is therefore not a situation where the deed unambiguously grants "to the shore," "to the bank," "to the seawall," or to another unambiguous monument delineating the end of the upland nor is it a situation where both sideline boundary points are indisputably at the high-water

---

[8]The word "to" is considered a "word of exclusion." *See e.g.,* Snyder, 679 A.2d at 514. "Thus, a line running 'to' an object excludes that object." *Id.*

24

mark. Additionally, and also of significant importance, evidence was presented that at the time of the conveyance, Poor had a residence on the land situated on the high-water line with a porch that extended below the high-water mark. The evidence regarding this structure, casts considerable doubt on Plaintiffs' proposition that Hartley and Poor intended to exclude the flats and, in particular, generates uncertainty regarding the intent behind their reference to a measurement along the high-water mark.

All of the above evidence generates latent ambiguities that make attempting to ascertain Hartley and Poor's intent from the face of the deed alone untenable and unwise. A latent ambiguity "is created when, in applying the description to the ground, facts extrinsic to the document controvert or in some way render unclear the deed's apparently unambiguous terms." *Taylor v. Hanson*, 541 A.2d 155, 157 (Me. 1988). In the Court's view such a situation has arisen here in regard to the sideline boundary calls and to the other waterside call, "along high water mark of Penobscot Bay. . ." Because of the latent ambiguities generated by the evidence, it is unclear from the face of the deed whether Hartley intended to grant the intertidal flats to Poor or intended to bound the premises on the high water line and sever those flats from the upland. When a deed is affected by latent ambiguity, as this one is, the Court must consider any relevant extrinsic evidence, "including the circumstances existing at the time of the making of the deed or the contemporaneous construction of the deed by the grantee or grantor" to resolve the ambiguity and clarify the grantor and grantee's intention. *Snyder*, 679 A.2d at 513; *see also Bradford v. Cressey*, 45 Me. 9, 13 (1858) ("The intention of the party is always to be sought in the interpretation of deeds, as in other written instruments. If the language leaves that intention at all doubtful, the instrument should be examined and construed, when practicable, by the light of the circumstances which surrounded and were connected with the execution of the instrument."). The Court also looks to the applicable rules of construction to help ascertain the grantor and grantee's intent. *Id.*

Before proceeding further, the Court will first provide a more in-depth explanation of why it has determined that the waterside calls are ambiguous today when applied to the land. The Court will then examine the relevant extrinsic evidence for clarification as to whether Hartley intended to grant the intertidal flats to Poor and consider the relevant rules of construction.

Both Mr. Richards and Mr. Dorsky were unable to find the "iron bolt in the mouth of a brook" referenced in the deed. Nor does the record contain evidence demonstrating the previous existence of and particular location of that iron bolt. Regarding the "stake at the outlet of a gully," Mr. Richards found some disturbed iron pins lying in the vicinity of the high-water mark and what he determined as the outlet of the gully but appeared uncertain as to whether one of these pins was the "stake" that Hartley and Poor referred to. Mr. Dorsky did not testify regarding the stake, but his survey dated November 14, 2018, notes that he found rebar lying about 35 feet inland from the high-water mark where the gully is located; however, it is apparent from his survey that he did not take this piece of rebar to be the "stake at the outlet of a gully" referenced in the deed and that he did not rely on it as the boundary point. Based on this evidence, the Court finds that both the "iron bolt in the mouth of a brook" and the "stake at the outlet of a gully," which Hartley and Poor used to mark the locations of the sideline termini of the waterside boundary have not been found. Nor have the parties presented evidence that affirmatively establishes the previous existence of and particular locations of those monuments.

While the deed provides some redundancy regarding the general location of these boundary points by its reference to the "mouth of a brook" and "outlet of a gully," when these descriptions are applied to the ground the particular meaning behind Hartley's reference to these monuments, particularly the reference to the "mouth of a brook," becomes murky. The Penobscot Bay is a tidally influenced water body and the intertidal area along the Poor upland is fairly extensive, extending well over 500 feet from the mean high-water mark to the low water mark along much of the upland. When the water of the Bay is at low tide, the water from the brook can be seen flowing in a distinct stream from the upland through the intertidal area until it reaches the water of the Bay. Both experts' opinions

26

and common dictionaries agree that "the mouth" of a river, stream, brook, etc. is commonly understood as the general place where the flowing water body enters the receiving water body. However, when read with this common meaning in mind, the call to "the mouth of a brook" is not specific enough to resolve the ambiguity as to whether Hartley and Poor intended the boundary to terminate at the high-water mark or include the intertidal flats. The particular brook at issue flows into a tidally influenced water body (the Bay) and the water from the brook can be seen flowing in a distinct stream through the intertidal area to the Bay when the Bay is not at high tide—meaning that the particular point where the water of the brook enters into the water of the ocean is somewhat uncertain. For that matter, it is also uncertain whether Hartley and Poor referenced "the mouth" of the brook intending to call to the particular point where the water from the brook meets the water of the Bay or intended to simply characterize the general area where the brook can be seen flowing into the ocean and where the "iron bolt" could be found.

The opposing expert opinions of the surveyors did not clarify these uncertainties. Mr. Richards stated that "the mouth" of the brook flowing into an ocean is located at the center of the brook when it reaches the high-water mark. Mr. Dorsky, however, indicated that "the mouth" is located at whatever point the water of the brook reaches the water of the Bay, varying with the ebb and flow of the tide from low water to high water. Adding further uncertainty, even Mr. Richards most recent survey plan depicts this boundary point as terminating at a location below the high-water mark, contradicting some of this testimony. (see Pl.'s Ex. 66; Trial Tr. vol II at 8-9.) In these circumstances, the Court cannot, without indulging in broad speculation, determine, whether in calling to the "mouth of a brook," Hartley and Poor were referring to the location where the brook transects the high-water mark, the variable point where the water of the brook meets the water of the Bay as the tide rises and falls, or simply the general area in the vicinity of the brook where it can be seen flowing into the Bay.

The Hartley and Poor's intent behind the call "along high water mark of Penobscot Bay 410 ft. more or less. . ." is also unclear when it is put up against the evidence regarding Mr. Poor's residence

27

on the property. Four months before her conveyance to Poor, Hartley executed a will in which she describes how her real estate holdings in Belfast along the Penobscot Bay should be distributed. In that description she refers to a certain "lot upon which Frederick Poor has a cottage (for which the said Frederick Poor pays twenty-five dollars annually for ground rent)", an apparent reference to the land she would soon convey to Poor. (Stip. Facts re: "Harriet L. Hartley's Estate. . .", Ex. 1 at 3.) Ms. Eckrote testified that when she visited her grandfather, Fred Poor, at this cottage in the late 1950s. She described a structure that was situated on the edge of the bank with a porch extending outward from the bank towards the Bay. She testified that a person on that porch when the Bay was at high tide would see the porch surrounded by water flowing under the structure. This description is corroborated by the photos of the structure that have been admitted into the record. There was no evidence introduced at trial to suggest that the location of Poor's cottage at the time of Ms. Eckrote's childhood visits was any different from its location at the time of the 1946 Hartley to Poor conveyance. The existence of such a residential structure skirting the high-water mark creates significant uncertainty as to what Harley and Poor's intended by referring to the distance along the high-water mark in their description of the boundary and controverts Plaintiffs' insistence that the high-water mark was intended as the boundary, as it is highly unlikely that Hartley and Poor would intend to have the property boundary run through Poor's existing cottage.

Based on the disappearance of both the "iron bolt in the mouth of a brook" and "stake at the outlet of a gully" referenced in the deed, the uncertainty described above regarding the call to the "mouth of a brook," and the existence of a residential structure on the bank that extended below the high water mark, the Court concludes that the waterside boundary description in the Hartley-to-Poor deed is ambiguous as to whether Hartley and Poor intended the boundary of the property to stop at

the high water mark or extend to include the intertidal flats, which typically accompany[9] such an oceanfront property.

Having determined that the Hartley-to-Poor deed is affected by latent ambiguities that must be addressed, the Court now turns to the relevant extrinsic evidence and the applicable rules of construction to clarify these ambiguities and more accurately discern whether Hartley and Poor intended the deed to convey the intertidal flats.

Here, both the extrinsic evidence in the record and the applicable rules of construction favor construing the deed as conveying the intertidal flats to Poor. As previously discussed, the record indicates that at the time of the conveyance, Poor had a cottage situated on the bank of the upland with a porch extending outward beyond the high-water mark of the Bay. Ms. Eckrote testified that she visited this cottage as a child beginning in the late 1950s during trips with her family to see her grandparents. She testified that when it still existed, a person on the porch of this cottage, during high tide, would see the water of the Bay flowing under the porch and surrounding it. One can further infer based on the cottage's location that the immediate intertidal area around the porch would have been regularly used by Mr. Poor and constituted part of the cottage's curtilage. With these facts in mind, construing the deed as setting the property boundary at the high-water would be nonsensical. Poor was renting the cottage and the land from Hartley prior to their conveyance. Both of them would have certainly known of and considered the presence of the cottage when drawing up the boundary lines of the premises. To accept Plaintiffs' theory of the deed, the Court would effectively have to conclude that Hartley and Poor intended to draw a property boundary through Poor's residence on the bank of the Bay. This odd construction would leave part of Poor's residence protruding into Hartley's supposed intertidal property, creating an immediate and obvious source of dispute between them. The extrinsic evidence does not support such an abnormal outcome. It is far more likely that

---

[9] *See Snow*, 84 Me. at 17 ("It is also common knowledge that since the [Colonial Ordinance of 1641-47], the occupation of the flats has usually followed that of the upland, and that the flats are usually of no value without the upland. Conveyances of the upland are commonly supposed to convey the flats.")

Hartley and Poor intended the intertidal land to be conveyed along with the upland property and that they trusted in the common notion that in Maine, conveyances of upland oceanfront property "are commonly supposed to convey the flats" due to the Colonial Ordinance. *Snow*, 84 Me. at 17. Hartley and Poor's choice to use a measurement along the high-water mark to delineate the distance between the sidelines of the lot is reasonably explained by the fact that it would have been far easier and more convenient for them to measure along the upland edge of the shore as opposed to measuring the somewhat nebulous boundaries of the waterside edge of the shore at low tide. (*See* Trial Tr. vol III 49-50) (testimony of James Dorsky). Additionally, Hartley's 1945 will describes the Poor lot as "bounded by Penobscot Bay on the east," which suggests that Hartley considered the Poor lot as including the land up to the water of the Bay i.e., the intertidal flats. It is likely that when she described the property in her deed to Poor four months later, she intended to describe and convey the same lot described in the will. Finally, the fact that the brook can be seen flowing in a distinct stream through the intertidal area when the Bay is at low tide suggests that Hartley and Poor would have viewed the intertidal stream as a marker of the boundary line between their intertidal properties. All of this extrinsic evidence, taken together, strongly indicates that Hartley and Poor intended for the 1946 deed to grant Poor title to the intertidal flats appurtenant to their property.

To the extent the extrinsic evidence does not fully resolve the latent ambiguities, the rules of construction also favor interpreting the Hartley-to-Poor deed as conveying the intertidal flats to Poor. When a court is tasked with construing language in a deed to ascertain the grantor and grantees intention as to the boundaries of the property conveyed, "the court must resolve all ambiguities against the grantor and *in favor of the grantee." St. Pierre v. Grondin*, 513 A.2d 1368, 1370 (Me. 1986) (emphasis in original). Accordingly, this rule of construction calls for the Court to adopt a construction of the deed resolving the ambiguity in favor of the grantee, Fred Poor and his successors in interest, and would result in the Court construing the deed as conveying the flats to Poor.

To reiterate, it is Plaintiffs who bore the ultimate burden of proving that the Hartley-to-Poor deed severed the intertidal flats from Poor's upland. They have failed to carry that burden here. The Hartley to Poor deed does not clearly sever the flats from the upland. Its language describing the waterside property boundary is affected by latent ambiguities that cast considerable uncertainty on Hartley and Poor's intent regarding the intertidal flats. The extrinsic evidence on the issue does not favor Plaintiffs' assertion that Hartley intended to exclude the intertidal flats from her grant; instead, the evidence instead strongly indicates that Hartley intended to include the intertidal flats in her grant. Any remaining ambiguity on the issue left unresolved by the extrinsic evidence, would be resolved in favor of construing the deed as conveying the flats pursuant to the rule that "the court must resolve all ambiguities against the grantor and in favor of the grantee." *St. Pierre*, 513 A.2d at 1370. For all of these reasons, the Court concludes that Plaintiffs have failed to demonstrate that the Hartley-to-Poor deed severed the flats from the Poor upland. Having failed in this threshold task as well as their task of proving that Hartley intended to convey the Poor flats to the Butlers, Plaintiffs are unable to prove that they have title to those flats.

## C. Restrictive Covenant

Plaintiffs contend that even if they are not the rightful owners of the intertidal flats along the Eckrote and Morgan lots, they are entitled to a court order declaring that Lot 36, the Eckrotes' lot (previously part of the land owned by Fred Poor), is burdened by a restrictive covenant and a court order enjoining Nordic from laying pipes through the lot based on that purported covenant. Plaintiffs' contention regarding the purported covenant is based on the following language in the Hartley-to-Poor deed:

> The lot or parcel of land herein described is conveyed to Fred R. Poor with the understanding it is to be used for residential purposes only, that no business for profit is to be conducted there unless agreed to by Harriet L. Hartley, her heirs or assigns. . .

(Stip. Facts re: Title ¶ 19, Ex. 11.) They argue that this restrictive language burdened the Poor land by restricting the use of the property to residential purposes only and benefited Hartley's land

31

appurtenant to the Poor lot by giving Hartley the right to enforce the restriction. They contend further that the benefit and burden of this purported restrictive covenant runs with the land and that the burden is enforceable against Poor's successors in interest (the Eckrotes) by Hartley's successors in interest (Plaintiffs).

"A restrictive covenant is created by language in a deed or other document showing an agreement to refrain from doing something with respect to use of the land." *Wainwright v. Riddell*, Cum-RE-07-0275, 2009 Me. Super. LEXIS 56, at \*5 (Feb. 23, 2009); 20 Am. Jur. 2d § 148 (nature of restrictive covenants). Accordingly, the first step in the analysis of a restrictive covenant issue must always begin with an examination of the language in the deed. The proper interpretation of the language in a deed, "including a restrictive covenant," is a question of law. *Doyon v. Fantini*, 2020 ME 77, ¶ 7, 234 A.3d 1222. When interpreting a deed, "the language must be given its ordinary meaning, and if there is no ambiguity the plain meaning controls." *Id.* Language in a deed is considered ambiguous when "it is reasonably susceptible to different interpretations." *River Dale Ass'n v. Bloss*, 2006 ME 86, ¶ 6, 901 A.2d 809. When interpreting a restrictive clause or other language, the court "must look at the instrument as a whole." *Doyon*, 2020 ME 77, ¶ 7, 234 A.3d 1222. If the court determines that the restrictive language is ambiguous, "then extrinsic evidence may be consulted to ascertain the grantor's intent." *Id.* "In the absence of extrinsic evidence, the intent of the parties should be ascertained by resort to the rules of construction of deeds." *Matteson v. Batchelder*, 2011 ME 134, ¶ 16, 32 A.3d 1059.

For the burden of a restrictive covenant to be enforceable at equity against a successor in interest, the following criteria must be established: (1) the burden of the covenant touches and concerns the land; (2) the original parties intended to create the covenant and intended that the covenant run with the land; (3) the successor to the burden of the covenant has actual or constructive notice; (4) enforcing the covenant is reasonable[10] under the circumstances. *Andersen v. Bangor Hydro-Elec. Co.,*

---

[10] Regarding the question of whether enforcing a restrictive covenant is reasonable under the circumstances, the Law Court has articulated that "[a] variety of factors are relevant to the determination of enforceability,

32

Han-CV-09-0071, 2012 WL 10467424, at *2-3 (Me. Super. Ct., Sept. 21, 2012); 9 Powell & Wolf,

*Powell on Real Property* § 60.04 (2021);[11] *Green v. Lawrence*, 2005 ME 90, ¶ 11, 877 A.2d 1079 ("A

restrictive covenant will be enforced in equity only if it is reasonable under the circumstances."); *see*

*also State v. Moosehead Mt. Resort*, Ken-CV-16-0147, 2018 Me. Super. LEXIS 153, at *10 (May 7, 2018)

(following the requirements stated in *Andersen v. Bangor Hydro-Elec. Co.* in deciding whether a restrictive

covenant was enforceable at law). In determining whether the original covenanting parties intended

for the benefit and burden of the restrictive covenant to pass to successors in interest, the Court focuses

on the subjective intent of the parties. *Powell on Real Property* § 60.04[3][b] ("[T]he intention

requirement focuses on the subjective state of mind of the original covenanting parties."). If a

restrictive covenant is not enforceable at equity it is necessarily not enforceable at law. *See Andersen*,

2012 WL 10467424, at *2-3; *Powell on Real Property* § 60.04.

This Court previously addressed Plaintiffs' restrictive covenant in its June 4, 2020, Order on

one of Plaintiffs' several motions for summary judgment. In its order on that motion, the Court

concluded that the paragraph of the deed that "Plaintiffs insist is a restrictive covenant is ambiguous

---

including the reasonableness of the obligation in terms of its scope and duration, and the clarity with which it is defined." *Dale Henderson Logging Inc. v. DOT*, 2012 ME 99, ¶ 27, 48 A.3d 233.

[11] As to the requirements that must be met for a restrictive covenant to run at law and to run at equity, Powell's oft-cited treatise states:

The elements most often said to be required for covenants to run at law are that:

(1) the covenant "touch and concern" the land;
(2) the original covenanting parties intend the covenant to run; and
(3) there be some form of privity of estate. 14

A fourth requirement, that the covenant be in writing, is also sometimes mentioned. Most jurisdictions now consider all covenants to be interests in real property. Accordingly, local statutes of frauds require them to be in writing. For covenants to run in equity, courts require that:

(1) the covenant "touch and concern" the land;
(2) the original covenanting parties intend the covenant to run; and
(3) the successor to the burden have "notice" of the covenant.

9 Powell & Wolf, *Powell on Real Property* § 60.04 (2021).

when considered in [context of] the entire deed." (Order on Plaintiffs' Motions for Summary Judgment, at *7 (June 4, 2020)). In reaching this conclusion, the Court pointed out that

> [t]he paragraph at issue conveys the property to Fred Poor—and only Fred Poor—with the requirement that it be used for residential purposes with no business for profit conducted thereon unless agreed to by Harriet Hartley, her successors, or assigns. Yet, elsewhere in the deed, Hartley invoked Fred Poor and his heirs and assigns. In fact, Hartley specifically references them on five occasions in the deed before the paragraph at issue on this motion. . .[12]

*Id.* at *7. The Court further noted that Hartley did not expressly state in the deed that "she wanted to bind Fred Poor, his heirs, and assigns with the purported restrictive covenant, even though she was capable of doing so in other portions of the deed. . .." *Id.* at *7. The Court also identified that in a previous case involving a single-family use restriction, the Law Court had held that in circumstances where the deed containing the restriction does not reference "running with the land," "benefiting the parcel retained by the grantors," or binding "heirs, successors, and assigns" the trial court will need to examine extrinsic evidence to determine if the covenanting parties intended for the restrictive covenant to run with the land. *Id.* at *8-9; *Friedlander v. Hiram Ricker & Sons, Inc.*, 485 A.2d 965, 967 (Me. 1984). Based on the language in the deed, the Court held that it was clear that Hartley intended to create a covenant benefiting herself and her successors by requiring Fred Poor to obtain her or her successors' permission before using his land for a nonresidential use. But, also held that it was unclear, from the language of the deed taken as a whole, that Hartley intended to have the restriction apply to Poor's successors and unclear that Poor agreed to the restriction's application against his successors.

---

[12] The Court then identified the following portions of the deed, which reference Poor's heirs and assigns:

- "I do hereby acknowledge, do hereby give, grant, bargain, sell and convey, unto the said [1] Fred R. Poor, his heirs and assigns forever";
- "TO HAVE AND TO HOLD the aforementioned and bargained premises with all the privileges and appurtenances thereof, to the said [2] Fred R. Poor, his heirs and assigns, to [3] his and their use and [illegible] forever";
- "And I do Covenant with the said [4] Grantee, his heirs and assigns, that I am lawfully seized in fee of the premises"; and,
- "I and my heirs shall and will Warrant and Defend the same to the said [5] Grantee, his heirs and assigns forever."

(Order dated June 4, 2020, at *7.)

34

Therefore, the Court held that the restrictive language in the deed is ambiguous, as the purported restriction could be plausibly read to mean "that the burden was only intended to apply to Fred Poor while he owned the property, and that, while he owned the property, Hartley [and her successors in interest] could enforce this covenant against him." (Order dated June 4, 2020, at *8.)

After concluding that the restrictive language in the Hartley to Poor deed was ambiguous, the Court reviewed the summary judgment record for any extrinsic evidence bearing on Hartley and Poor's intentions regarding the restricting language. The only evidence provided by either side was Harriet Hartley's will, which was executed on September 25, 1945, months before she executed the deed conveying land to Poor. The Court found the will to have only "negligible" usefulness in discerning Hartley's intent on this issue, as the will stated that she was giving the Poor land to someone else, the will was executed before the Poor conveyance, and there "is nothing in the will to indicate that Hartley was unable to change her mind and her intentions as it pertains to lot 36." (Order dated June 4, 2020, at *9.) Having determined that the restrictive language in the deed is ambiguous and that there was no useful evidence in the summary judgment record regarding Hartley's intent as to whether the restriction was to run to Poor's successors, the Court denied Plaintiffs' motion for summary judgment. *Id.* at *9-10.

The Court is not inclined to abandon its earlier analysis of the issue here. The Hartley-to-Poor deed is ambiguous in that it is not clear whether Hartley and Poor intended the burden of the covenant to run to Poor's successors in interest and the information provided by Harriet Hartley's 1945 will is insufficient to clarify their intent. Accordingly, the principal questions for the Court on this matter now are (1) whether Plaintiffs have presented any new extrinsic evidence that is sufficient to resolve the ambiguity in their favor; and (2) if not, which party prevails under the applicable rules of construction?

The only new evidence that Plaintiffs presented regarding Hartley and Poor's intent is opinion testimony from their surveyor, Donald Richards. The relevant testimony is found in volume I of the trial transcript at pages 76-77 and is reproduced below.

35

[Direct Examination of Donald Richards by David Perkins, attorney for the plaintiffs]

Q: In the Hartley to Poor deed is there a paragraph that has a restriction on residential use of the property?

A: Near the end of the deed there is a statement that reads, the lot or parcel land herein described is conveyed to Fred R. Poor with the understanding that it is to be used for residential purposes only; that no business for profit is to be conducted there unless agreed to by Harriet L. Hartley, her heirs or assigns.

Q: And as a surveyor do you review whether the property being surveyed is subject to negative easements or restrictive covenants?

A: I do. That is part of my responsibility.

Q: And what's your interpretation of that language?

A: Harriet Hartley had the right to grant any and all of that property to Fred R. Poor. She also had the right to retain whatever rights in that property she did. Every appearance on that is that she is retaining for herself as appurtenant to her remaining land that negative easement on the Fred Poor tract.

Q: What is your interpretation of that negative easement in terms of its impact today on the title?

A: Because it was created to benefit her residual land, it would be appurtenant to the land and therefore would carry forward even if it was not cited in subsequent deeds. So I would -- my understanding as a surveyor is that that would be a currently existing negative easement on the Fred Poor property for the benefit and appurtenant to all her remaining land at the time of that conveyance.

(Trial Tr. vol I at 76-77.) In sum, Richards testified that he read the Hartley-to-Poor deed and he thinks that the deed includes a restrictive covenant prohibiting Poor and his successors from using the property for any nonresidential purpose. Defendants did not present any new evidence on the issue.

Mr. Richard's legal opinion on the issue of whether the Hartley-to-Poor deed includes an enforceable restrictive covenant is not persuasive evidence in this proceeding. "[C]onstruction of a deed, including a restrictive covenant, is a question of law" for the presiding judge or justice. *Doyon*, 2020 ME 77, ¶ 7, 234 A.3d 1222. Mr. Richards' opinion on the proper interpretation of a deed is certainly more informed than that of a lay person, but Maine law clearly designates the interpretation of a deed as a matter of law for the Court. Moreover, Mr. Richards' testimony is not particularly helpful or sufficient to resolve the ambiguity described above. The Court therefore concludes that the

36

record shows an absence of any other new relevant evidence on the issue of whether Hartley and Poor intended the burden of the covenant to run to Poor's successors in interest.

As Plaintiffs have failed to present any new evidence on the issue of intent other than their surveyor's legal conclusion, the Court will move on to the next step of the analysis—resolving the ambiguity by applying the rules of construction of deeds. *Matteson*, 2011 ME 134, ¶ 16, 32 A.3d 1059 ("In the absence of extrinsic evidence, the intent of the parties should be ascertained by resort to the rules of construction of deeds."). The two rules of construction most applicable here provide that: (1) a restrictive covenant should be given "a narrow and strict construction" and; (2) where a restrictive covenant is ambiguous, the ambiguity should be "resolved in favor of less restrictive uses of property." *Boehner v. Briggs*, 528 A.2d 451, 453 (Me. 1987); *see also Midcoast Cohousing Land Acquisition, LLC v. Riverhouse Tr.*, 2008 ME 70, ¶ 10 n.3, 946 A.2d 421 ("If the language was ambiguous, we would construe it in favor of the free use of property and against the limitation."); *Naiman v. Bilodeau*, 225 A.2d 758, 759 (Me. 1967) ("The majority rule [provides that]. . .Doubt will be resolved in favor of the unrestricted use of property, so that where the language of a restrictive covenant is capable of two constructions, the one that limits, rather than the one which extends it, should be adopted, and that construction should be embraced which least restricts the free use of the land."). In sum, where a restrictive covenant is deemed ambiguous—meaning, the covenant is capable of two or more plausible constructions—the court is to read the covenant narrowly and adopt the construction that is less restrictive on the use of property.

The nonresidential use restriction in the Hartley-to-Poor deed has two plausible constructions: (1) the covenant restricted *Fred Poor and only Fred Poor* from using the property for any nonresidential use without the permission of Hartley or her successors in interest; and (2) the covenant restricted *Fred Poor and his successors in interest* from using the property for any nonresidential use without the permission of Hartley or her successors in interest. The first construction is less restrictive than the second because it would have the restriction effectively terminate upon Fred Poor conveying his

37

interest to someone else. Therefore, according to the interpretative rules just discussed, the Court adopts the first construction and discards the second.

The Court thus concludes that Hartley and Poor intended the restrictive language in their deed to apply only to Fred Poor's usage of the land and did not intend for this burden to run with the land. Plaintiffs are not entitled to relief based on an alleged restrictive covenant in the Hartley-to-Poor deed because this purported covenant does not meet the requirements to be enforceable against Poor's successors in interest.

### D. Plaintiffs' Claims Regarding the Schweikerts' Intertidal

The Schweikerts own Lot 37, which is situated to the South of the Eckrotes' lot and immediately adjacent to plaintiffs Mabee and Grace's lot. It was included in the conveyance from Hartley to the Butlers in 1950 and consists of the land that the Butlers' successors in interest, Marjorie and Ernest Bell, conveyed to John and Catherine Grady in 1964. The property was thereafter conveyed through deeds using the same property description in the Bells-to-Gradys deed until it was eventually obtained by the Schweikerts. Plaintiffs claim that when the Bells conveyed Lot 37 to the Gradys they conveyed only the upland, severing the intertidal and reserving it for themselves until conveying it to Plaintiffs' predecessors in interest. Plaintiffs' claim to title is therefore premised on the language used to describe the property in the 1964 Bells-to-Gradys deed. The relevant portion of this deed is reproduced again below, for the convenience of the reader.

> . . . commencing at a point on the southern easterly right-of-way line of U. S. No. 1 at a concrete culvert; thence southwesterly along said right-of-way line one hundred eighty-seven (187) feet to a point six (6) feet, more or less, northwesterly of an iron pin; **thence South 48 20' East one hundred thirty-eight (138) feet, more or less, to an iron pin and continuing on the same course thirty-nine (39) feet, more or less, to the high water mark of Penobscot Bay; thence turning and running northeasterly along said high water mark three hundred thirty-three (333) feet, more or less, to an iron pipe;** thence turning and running generally northwesterly and following the gully that marks the line between land of Ernest J. Bell and Marjorie N. Bell, and land of Fred R. Poor, to the point of beginning.

(Stip Facts re: Title ¶ 32-33) (referencing Ex. 21 attached thereto). This same description is used in all of the subsequent deeds conveying the property thereafter, including the deed under which the

38

Schweikerts claim title. The parties have stipulated that the "iron pipe" referenced in this deed is a reference to the "iron bolt in the mouth of a brook" that was called to in the 1946 Hartley-to-Poor deed and that the references to the "iron pipe" and the "iron bolt in the mouth of a brook" call to the "same general location." (*Id.* ¶ 38.) None of the parties argued or raised issues at trial suggesting the Bells-to-Gradys deed is affected by latent ambiguity.

Again, the first step in determining what the boundaries are from the deed is to look to the common and ordinary meaning of the words on the face of the deed to discern the intent of the grantor and grantee. The Law Court has held that a conveyance of oceanfront property presumptively includes the flats running along the upland if the grantor "bounds the land sold on the sea or salt water, or describes other boundaries of equivalent meaning, without any reservation of the flats." *Almeder*, 2019 ME 151, ¶ 37, 217 A.3d 1111 (quoting *Storer*, 6 Mass. at 439). If the presumption is triggered by such a 'call to the water,' other language in the deed limiting the grant "to' or 'by' the shore, beach, bank, or sea shore may defeat the presumption." *Almeder*, 2019 ME 151, ¶ 37, 217 A.3d 1111.

The Law Court spoke specifically regarding deeds that bound a parcel of land by the high-water mark in *Lapish,* 8 Me. at 89-90.[13] The pertinent section of that opinion is reproduced below:

> Every course and every monument mentioned in the foregoing description is on the upland or bank; and from the language of the deed in describing the last course, it appears that the stake begun at, was at high-water mark. In *Storer v. Freeman,* 6 Mass. 435, *Parsons, C. J.,* in delivering the opinion of the court, says, "The sea-shore must be understood to be the margin of the sea, in its usual and ordinary state. Thus when the tide is out, low-water mark is the margin of the sea, and when the sea is full, the margin is high-water mark. The sea-shore is, therefore, all the ground between ordinary high-water mark and low-water mark." In that case the land conveyed was bounded by the shore, and the court decided that the flats did not pass by the deed. **Now, as high-water mark is one side of the sea-shore or flats, and low-water mark is the other, and as a deed bounding land on one side by the shore, does not convey the flats, it is perfectly clear that a deed bounding a piece of land by high-water mark, which is one side of the shore, cannot be construed as conveying the flats.**

*Id.* (emphasis added). Based on the above language, it appears that the Law Court would consider it "perfectly clear" that a deed which grants 'to the high-water mark' and then 'along the high-water

---

[13] The Court briefly noted this decision in its analysis of the Hartley-to-Poor deed.

mark' does not convey the flats, as the high-water mark is recognized as the landward side of the seashore, *Id.*, and a call for a "line running 'to' an object excludes that object." *Snyder*, 679 A.2d at 514. The opinion in *Lapish* therefore indicates that the Law Court would view the grant in the Bells-to-Gradys deed, "to the high water mark of Penobscot Bay; thence turning and running northeasterly along said high water mark three hundred thirty-three (333) feet . . .", as bounding the land by the landward edge of the shore and excluding the flats from the conveyance.

At first blush, it may appear to the reader that the call in the Hartley-to-Poor deed "along the high water mark of Penobscot Bay. . ." should be treated the same way as the call "to the high water mark of Penobscot Bay. . ." found in the Bells-to-Grady deed. However, there are very important differences between the two grants which cause the two deeds to yield different results when scrutinized. As mentioned previously, the word "to" is a "word of exclusion" when used in describing a premises. Snyder, 679 A.2d at 514. When a deed describes a boundary line running "to" an object, the call is taken to mean that the line runs to the object and excludes it from the premises. *Id.* The Law Court has thus held that deeds which grant to the landward edge of the shore and then by the shore exclude the shore from the premises. *See Montgomery v. Reed*, 69 Me. 510, 514 (1879) (holding that a deed that called "to the shore" and then called "thence northerly and westerly, as the shore lies, round a point of land and round the head of a cove. . ." excluded the flats from the premises); *Whitmore v. Brown*, 100 Me. 410, 414 (1905) (a call "to the shore and then by the shore," unqualified by other language or evidence, excludes the shore); *Sinford v. Watts*, 123 Me. 230, 232-33, 122 A. 573, 574-75 (1923) ("If on the other hand the description began at a known monument on the upland and ran given courses and distances around to the shore and thence by the shore, the shore itself would be excluded and the line would run only to high-water mark. . ."); *Nickerson v. Crawford*, 16 Me. 245, 245 (1839) (holding that a grant "to the margin of the cove, then westerly along the margin of the cove about eleven rods" excluded the flats). The Hartley-to-Poor deed called to a point in a mouth of a brook which, under the circumstances shown, can be reasonably understood to refer to a location

40

below the high-water mark; the deed then called "along the high water mark." The language of the Hartley-to-Poor deed therefore did not unambiguously call to a point on the upland and then call for a premises along the edge of the upland as the calls described in *Montgomery, Whitmore,* and *Sinford,* which would exclude the flats. In contrast, the Bells-to-Gradys deed does not have this nuance, it calls directly "to the high water mark" and then "thence turning and running northeasterly along said high water mark three hundred thirty-three (333) feet, more or less. . ." Because "to" is treated as a word of exclusion, it is clear under the governing law that the grant "to the high water mark" describes a premises running to and excluding the high water mark. The following call "along the high water mark" a certain distance, unqualified by other language or evidence, then provides that the premises is to run along the landward margin of the shore. Under the Law Court's previous decisions, such a deed must be construed as excluding the intertidal flats.

There are also some less subtle differences between the claims regarding the Bells-to-Gradys deed and the Hartley-to-Poor deed that result in a differing analysis and outcome. For instance, none of the interested parties raised an issue or argued at trial that the Bells-to-Gradys deed is affected by latent ambiguity. Additionally, the deeds involve two different grantors and were executed eighteen years apart. The circumstances under which Hartley made her conveyance to Poor are not relevant to the interpretation of the Bells-to-Gradys deed and there was no other evidence presented at trial that generates a similar sort of uncertainty regarding Marjorie Bells' intent when she conveyed land to the Gradys. The question of what Marjorie Bells' intent was when she granted land to the Gradys is a wholly separate question from what Hartley's intent was when she granted land to Poor.

Returning now to the waterside grant in the Bells-to-Grady's deed, "to the high water mark of Penobscot Bay; thence turning and running northeasterly along said high water mark three hundred thirty-three (333) feet, more or less, to an iron pipe," it is apparent from the Law Court's explanation in *Lapish* and the subsequent cases that the deed does not convey the flats. The deed grants "to" the high-water mark of the Bay and then "along" the high water mark a certain number of feet, "more or

less. . ." The high-water mark is considered to be the landward side of the intertidal flats along the Bay. Therefore, the Butler-to-Gradys deed effectively bounds the land by the landward margin of the shore (the high-water mark). A grant such as this, "bounding a piece of land by high-water mark, which is one side of the shore, cannot be construed as conveying the flats." *Lapish*, 8 Me. at 90. For these reasons, the Court concludes that the Butlers-to-Gradys deed did not convey the intertidal flats along the upland to the, Schweikerts' predecessors in title, the Gradys. The Schweikerts therefore, did not obtain title to the intertidal flats abutting the upland when they obtained title to the land conveyed under the Bells-to-Gradys deed.

The next question at issue is whether Plaintiffs have shown that they obtained title to these intertidal flats when they obtained title to their upland through their grantors, the Trainors. As previously mentioned, Plaintiffs claim title to the intertidal in front of the Schweikerts' upland through the Hartley-to-Butlers deed. The parties agree that this deed conveyed all of Hartley's remaining land along the Penobscot Bay after her conveyances to Poor and Cassida, which today would comprise Lots 38 and 37 along with the intertidal appurtenant to the uplands of those Lots. The Butlers then conveyed the entirety of this land to the Bells and the Bells conveyed Lot 37 to the Schweikerts predecessors in interest, the Gradys. As the Court just explained, the conveyance from the Bells to the Gradys did not convey the intertidal flats along Lot 37 to the Gradys, effectively severing and reserving those flats for the Bells. The parties have stipulated that Marjorie Bell then conveyed the remaining land she and her deceased husband had obtained from the Butlers to Plaintiffs' predecessors in interest, the Trainors. The Bells-to-Trainors deed described the boundaries of this property by reciting the same description used in the 1950 Hartley-to-Butlers deed and then excepting the land the Bells had transferred to the Gradys from the conveyance. (*Id.* ¶ 41.) Given this record, the Court concludes that the Bells-to-Trainors deed conveyed the intertidal flats appurtenant to Lot 37 to the Trainors. The property that the Bells conveyed to the Trainors was thereafter transferred amongst various owners using, effectively, the same property description until it was acquired by plaintiffs

42

Mabee and Grace on May 31, 1991. (*Id.* ¶¶ 39-55.) The deed transferring the land to Mabee and Grace includes the additional language: "Together with our right, title and interest in and to that portion of the premises which lies between high and low water mark, commonly designated as the flats." (Stip. Facts re: Title ¶ 55.)

Having concluded that the Schweikerts do not own the intertidal appurtenant to their upland, it is apparent from the above accounting of the trial record that the intertidal land appurtenant to the Schweikerts' lot was obtained by Plaintiffs when they took title in 1991 to the same land that the Bells conveyed to the Trainors. The Court thus concludes that Plaintiffs have proven superior title to the intertidal land appurtenant to the Schweikerts' upland (Lot 37).

### E. Plaintiffs' Requests for Injunctive Relief

Count III of Plaintiffs' complaint requests the following equitable and injunctive remedies: (1) a permanent injunction prohibiting the Eckrotes' from granting an easement to Nordic permitting Nordic to install the underground pipes for its fish farm through the Eckrotes' land; (2) a permanent injunction requiring the Eckrotes to record a deed or other document that states the boundaries of their property in such a way that acknowledges that Plaintiffs are the rightful owners of the intertidal land along the Eckrotes' upland; (3) a permanent injunction prohibiting Nordic from claiming title, right, or interest to the intertidal flats appurtenant to the Schweikerts upland based on a certain "ground lease" executed in July 11, 2020; (4) an order awarding Plaintiffs court costs and fees.

Count IV of the complaint requests a court order that: (1) declares that Plaintiffs' conservation easement serves the public interest; (2) prohibits Defendants from taking any actions in Plaintiffs' purported intertidal land that is contrary to their conservation easement; (3) prohibits the Schweikerts and Lyndon Morgan from taking any action that is contrary to Plaintiffs conservation easement "and Colonial Ordinance of 1641-1647"; (4) generally "enforces the protections and purposes of the Conservation Easement that Plaintiffs Mabee and Grace imposed on their intertidal land against all persons and government entities, in perpetuity." (Compl. at 49.)

43

The governing rules regarding the availability of injunctive relief are well established. To obtain a permanent injunction, the party seeking the injunction must show that:

> (1) the party would suffer irreparable injury if the injunction is not granted; (2) such injury outweighs any harm that granting injunctive relief would inflict on the party opposing the injunction; (3) the public interest will not be adversely affected by granting the injunction; and (4) the plaintiff succeeds on the merits.

*Windham Land Tr. v. Jeffords*, 2009 ME 29, ¶ 41, 967 A.2d 690. The Court will consider and weigh "all of these factors together in determining whether injunctive relief is proper in the specific circumstances of the case." *Id.*

All of Plaintiffs' requests for injunctive relief regarding the Eckrote and Morgan intertidal flats, including those pertaining to Nordic and its plans to install underground pipes, are denied because Plaintiffs have not shown that they have any title, right, or interest to that the intertidal land nor have Plaintiffs shown that the Eckrote and Morgan lands are burdened by an enforceable restrictive covenant as they have contended. The conservation easement that plaintiffs Mabee and Grace granted to Upstream Watch and which was then assigned to Friends of the Harriet L. Hartley Conservation Area is not valid and enforceable as to the intertidal land appurtenant to the Eckrote and Morgan uplands because Mabee and Grace never had any title, right, or interest in that land to convey. However, the conservation easement is otherwise valid and enforceable to the extent it burdens the intertidal flats appurtenant to Mabee and Grace's and the Schweikerts' upland lots. Because Plaintiffs have not shown that they actually have title, rights, or interest to the intertidal land appurtenant to the Eckrote and Morgan upland parcels, Plaintiffs are unable to demonstrate that that they have met any of the requirements for obtaining their requested injunctions pertaining to that land.

The Court declines to grant Plaintiffs an injunction prohibiting Nordic from claiming title, right or interest under a "ground lease" that the Schweikerts allegedly granted to Nordic. Plaintiffs have failed to offer a record of this document at trial, submit sufficient evidence at trial showing what the terms of that alleged "ground lease" are, or otherwise present evidence at trial showing that such a lease actually exists. The Court also declines to grant Plaintiffs an injunction prohibiting the

44

Schweikerts and Morgan from taking actions that are contrary to Plaintiffs' conservation easement or the "Colonial Ordinance of 1641-1647." The Court has determined in this matter that Plaintiffs are the rightful owners of the intertidal flats appurtenant to the Schweikert upland but have no title or rights to the intertidal flats appurtenant to the Eckrote and Morgan uplands. Although Plaintiffs own the flats appurtenant to the Schweikerts' upland they have not presented sufficient evidence to establish that the Schweikerts have engaged in any activity that would suggest they are violating Plaintiffs' ownership rights in such a way that is resulting in any irreparable injury to the plaintiffs. Nor have plaintiffs submitted any evidence that the Schweikerts intend to take action in the future that would be contrary to the Court's decision that Plaintiffs are the rightful owners of the intertidal flats appurtenant to their Schweikerts' lot or that the Schweikerts intend to take action that is contrary to the conservation easement affecting those flats. Nor for that matter have Plaintiffs presented any evidence that Morgan has engaged in any activity contrary to Plaintiffs' property rights or the conservation easement or that he intends to engage in such activity in the future. Based on this record, the Court concludes that Plaintiffs have failed to show that they would suffer irreparable injury if the requested injunction is not granted and have failed to show that the public interest would not be adversely affected by granting such an injunction in these circumstances.

The Court further declines to grant Plaintiffs a general injunction that "enforces the protections and purposes of the Conservation Easement that Plaintiffs Mabee and Grace imposed on their intertidal land against all persons and government entities, in perpetuity." (Compl. at 49.) Again, because Mabee and Grace did not have title to the flats appurtenant to the Eckrote and Morgan uplands, the conservation easement they granted to Upstream Watch is not valid as to those flats. The conservation easement is therefore only enforceable to the extent it covers Mabee and Grace's intertidal flats, which are those appurtenant to their upland (Lot 38) and the Schweikert upland (Lot 37). Although enforceable as to those intertidal flats, Plaintiffs have not developed a record that would justify the Court entering a general injunction "against all persons and the government" prohibiting activity contrary to the conservation easement. Nor have Plaintiffs presented evidence showing that

45

members of the public at large or the government are in fact taking actions that are violating the protections of the conservation easement over these intertidal flats and that are resulting or will result in irreparable injury if the injunction is not granted. Nor have Plaintiffs presented evidence showing that the public interest will not be adversely affected by granting an injunction in such circumstances.

Finally, the Court declines to grant Plaintiffs' request for court costs and litigation fees, as the Plaintiffs have not developed a basis for awarding such costs and fees.

## III.    CONCLUSION AND JUDGMENT

Phase I of the trial in this case has concluded. Pursuant to M.R. Civ. P. 54(b)(1), the Court now enters a judgment as to Counts I-IV of Plaintiffs' complaint, Count I of Nordic's counterclaims, and Counts I, II, V, and VI of the Eckrote's counterclaims, as there is no just reason for delaying the entry of a judgment on these claims. The Court enters judgment on these Counts as follows: [14]

1.  The Court declares that the 1946 Hartley-to-Poor deed (Waldo County Registry of Deeds, Book 452, page 205) did not sever the intertidal flats from the upland property described in that deed. The deed conveyed the intertidal flats appurtenant to the upland to Frederick Poor.

2.  The Court declares that the 1950 Hartley-to-Butlers deed (Book 474, page 387) conveyed the uplands which are now referred to as Lot 38 and Lot 37 on Belfast Tax Map 29, to the Butlers, along with the intertidal flats that are appurtenant to those uplands.

3.  The 1950 Hartley-to-Butlers deed did not convey the intertidal flats which are appurtenant to the upland which was once owned by Frederick Poor.

4.  Plaintiffs Mabee and Grace have no title, rights, or interest in the intertidal flats which are appurtenant to the upland which was once owned by Frederick Poor.

5.  The conservation easement that Mabee and Grace conveyed to Upstream Watch and which is now held by Friends of the Harriet L. Hartley Conservation Area is not enforceable to the extent it purports to convey or restrict rights, title, or interest to the intertidal flats appurtenant to the uplands previously owned by Fred Poor.

6.  The 1964 Bells-to-Gradys deed (Book 621, page 288) severed the intertidal flats from the upland property described in that deed. The intertidal flats appurtenant to that upland were retained by Marjorie Bell after her conveyance to the Gradys. The upland property conveyed in that deed terminates at the high-water mark of the Penobscot Bay.

---

[14] The Court does not enter any judgment on the claims to be tried in the second phase of this trial.

7. Marjorie Bell conveyed the intertidal flats which are appurtenant to the upland now owned by the Schweikerts to Mabee and Grace's predecessors in interest, the Trainors, in 1966 through the deed recorded in Book 652 at page 116.

8. Plaintiffs obtained fee simple title to the intertidal flats appurtenant to the Schweikerts' upland from Heather O. Smith in 1991 through the deed recorded in the Waldo County Registry of Deeds in Book 1221 at page 347.

9. Plaintiffs also have fee simple title to the intertidal flats that are appurtenant to their upland property, Lot 38, through the same deed.

10. The boundaries of plaintiffs Mabee and Grace's intertidal land are as depicted on Plaintiffs' Ex. 6, a survey prepared by surveyor James Dorsky and which is dated November 14, 2018.[15] The survey depicts Plaintiffs' intertidal land as including the intertidal land appurtenant to Lots 37 and 38 of Belfast Tax Map 29 from the mean high-water line of the Penobscot Bay to the low-water line of Penobscot Bay. The survey depicts the northerly boundary of Plaintiffs' intertidal land with a dashed, bold, dark blue line that marks the edge of Mabee and Grace's intertidal property line and the beginning of the intertidal zone labelled on the survey with the notation "Harriet L. Hartley." The survey does not depict Mabee and Grace as the owners of the intertidal zone appurtenant to Lot 36 and Lot 35.

11. The boundaries of the Eckrotes' intertidal land are as depicted on James Dorsky's November 14, 2018 survey (Pl.s' Ex. 6) and as described as follows:
    a. The intertidal land marked with the notation "Harriet L. Hartley" appurtenant to the upland property marked "Janet Eckrote [,] Richard Eckrote" and which lies between the dashed, bold, dark blue line that marks the northerly boundary of Mabee and Grace's intertidal and the dashed, bold, grey line that marks the southerly boundary of the intertidal zone appurtenant to Lyndon Morgan's upland property.
    b. Such intertidal land extends from the mean high-water line of Penobscot Bay to the low-water line, within the sideline boundaries just noted, as depicted on the survey.

12. The boundaries of Lyndon Morgan's intertidal land are as depicted on James Dorsky's November 14, 2018 survey (Pl.'s Ex. 6) and as described as follows:
    a. The intertidal zone appurtenant to the upland with the notation "Lyndon G. Morgan."
    b. This intertidal zone is marked on the survey as lying between the dashed, bold, dark blue line that marks the southerly boundary of the intertidal zone owned by Rodney D. Helmers and Donna G. Helmers and the dashed, bold, grey line that runs through the middle of the intertidal zone marked on the survey with the notation "Harriet L. Hartley."
    c. Such land extends from the mean high-water line of Penobscot Bay to the low-water line, within the sideline boundaries just noted, as depicted on the survey.

13. At the time of her death on October 18, 1951, Harriet L. Hartley owned no real property in Belfast, Maine and her estate conveyed no real property to her intended heirs or heirs at law.

---

[15] This survey was produced before the Schweikerts took title to Lot 37. It therefore notes the owners of Lot 37 as Larry D. Theye and Betty Becker-Theye, the Schweikerts' predecessors in interest.

47

14. None of the quitclaim deeds executed by the individuals Robert L. Burger, Thomas A. Burger, Robert L. Burger II, David Woods, Marcia L. Woods, David Wesley Bell, Karen L. Stockunas, Constance Daily, Barbara Bell, or Sandra L. Bell conveyed title to the intertidal flats appurtenant to Lots 37, 36, or 35 to Nordic, as these individuals did not have title to convey.

15. The conservation easement that plaintiffs Mabee and Grace granted to Upstream Watch and which Upstream assigned to Friends of the Harriet L. Hartley Conservation Area is valid and enforceable to the extent that it purports to convey and restrain property rights pertaining to the intertidal flats appurtenant to Mabee and Grace's upland and the Schweikerts' upland. These upland properties being depicted on Belfast Tax Map 29 as Lots 37 and 38. It is not valid as to any of the intertidal flats appurtenant to Lots 36 and 35, as Mabee and Grace did not have title, rights, or interest in that land to convey.

16. All other requests for declaratory judgment and to quiet title to property in Count I and Count II of Plaintiffs' complaint are denied.

17. The Court therefore enters a partial judgment in favor of Plaintiffs on Count I and Count II of the Complaint, as described in this judgment.

18. The Court enters judgment in favor of the Eckrotes on Counts I and VI of the Eckrotes' counterclaims.

19. Counts II and V of the Eckrotes' counterclaims are moot, as the Court has determined that the Eckrotes obtained title to the intertidal appurtenant to their upland through the deed recorded at Book 3697, page 5, of the Waldo County Registry of Deeds.

20. The Court enters judgment in favor of Nordic on Count I of its counterclaims.

21. Plaintiffs have failed to demonstrate that they are entitled to any of the injunctive and equitable relief that they seek in Count III and Count IV of their complaint. The Court therefore enters judgment against Plaintiffs on Count III and Count IV of the Complaint.

The Clerk is directed to incorporate this judgment on the docket by reference in accordance with M.R. Civ. P. 79(a).

Dated: 10/27/21

_____
Robert Murray, Justice
Maine Superior Court

48